**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 9 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

FIRST UNITARIAN CHURCH OF
SALT LAKE CITY; UTAHNS FOR
FAIRNESS; UTAH NATIONAL
ORGANIZATION FOR WOMEN;
CRAIG S. AXFORD,

      Plaintiffs-Appellants,

v.

SALT LAKE CITY CORPORATION,
a municipal corporation,

      Defendant-Appellee,

CORPORATION OF THE
PRESIDING BISHOP OF THE
CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS,

      Defendant-Intervenor-Appellee,

No. 01-4111

ASSOCIATION OF CHRISTIAN
SCHOOLS INTERNATIONAL;
COLORADO BAPTIST GENERAL
CONVENTION; COLORADO
CATHOLIC CONFERENCE;
COMMUNITY OF CHRIST;
DIOCESE OF COLORADO;

EVANGELICAL LUTHERAN CHURCH IN AMERICA; FIRST CHURCH OF CHRIST, SCIENTIST; GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS; ISLAMIC SOCIETY OF COLORADO SPRINGS; MID-AMERICA UNION CONFERENCE OF SEVENTH-DAY ADVENTISTS; THE NAVIGATORS; ROCKY MOUNTAIN CONFERENCE OF SEVENTH-DAY ADVENTISTS; THE EVANGELICAL COVENANT CHURCH; THE GENERAL COUNCIL ON FINANCE AND ADMINISTRATION OF THE UNITED METHODIST CHURCH; WORLDWIDE CHURCH OF GOD; SUTHERLAND INSTITUTE; INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; NATIONAL LEAGUE OF CITIES; NATIONAL ASSOCIATION OF COUNTIES; AND UTAH ASSOCIATION OF COUNTIES,

Amici Curiae.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:99-CV-912-ST)**

---

Mark Lopez, American Civil Liberties Union Foundation, Inc., New York, New York (Stephen C. Clark, American Civil Liberties Union of Utah Foundation, Inc., Salt Lake City, Utah, with him on the briefs), for Plaintiffs-Appellants.

Roger F. Cutler (Steven W. Allred, Lynn H. Pace, and Boyd A. Ferguson, with him on the brief), Salt Lake City, Utah, for Defendant-Appellee.

Von G. Keetch (Alexander Dushku, with him on the brief), Kirton & McConkie, Salt Lake City, Utah, for Defendant-Intervenor-Appellee.

---

Before **SEYMOUR**, **McWILLIAMS** and **HENRY**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Plaintiffs brought this action under 42 U.S.C. § 1983 challenging on First Amendment grounds the prohibition of expressive activity by Salt Lake City on a public pedestrian easement retained by the City after the sale of a portion of a downtown public street to a religious organization. The district court granted summary judgment to defendant. *First Unitarian Church of Salt Lake v. Salt Lake City Corp.*, 146 F. Supp. 2d 1155 (D. Utah 2001). Plaintiffs appeal and, for the reasons stated below, we reverse and remand.

## I

The relevant facts set forth here are not in dispute. This case concerns a portion of Main Street in downtown Salt Lake City that the City closed and sold

to the Church of Jesus Christ of Latter-Day Saints (LDS Church).[1] Main Street runs north-south through downtown Salt Lake City. The portion sold to the Church is bounded on the north by North Temple Street and on the south by South Temple Street. To the north lies a residential neighborhood. To the south is the City's business district, including two large shopping malls.

The LDS Church owns all the property on the two city blocks on the east and west sides of this portion of the former Main Street. On these blocks the Church maintains a number of important historical, administrative, and worship facilities. The west block is called "Temple Square" and contains the Mormon Tabernacle and the Salt Lake Temple; the east block houses the Church administration buildings. Temple Square and related attractions are an extremely popular tourist attraction.

In 1995, the Salt Lake City Corporation (City) sold the subsurface rights to this portion of Main Street to the LDS Church, which the Church eventually developed into an underground parking garage. That agreement also gave the Church a right of first refusal on the surface property, should the City ever decide to sell it. In 1996, the City considered closing this portion of Main Street to automobile traffic but leaving it open to pedestrians, and also considered selling

_____

[1] The sale was actually to the Corporation of the Presiding Bishop, a corporate entity wholly owned by LDS Church. We refer to both entities as "LDS Church."

-4-

the land to the Church for this purpose. The proposal was eventually dropped.

In 1998, the City again explored the possibility of closing a portion of Main Street and selling it to the Church for the construction of a pedestrian plaza. On December 1, 1998, the City and LDS Church held a joint news conference to announce "a proposal to develop an open-space pedestrian plaza" on Main Street between North and South Temple. Aplt. App. vol. I at 356 (LDS Church news release). The Church thereafter filed a petition with the City for street closure and plans with the City Planning Commission for a pedestrian plaza.

On April 13, 1999, the City Council approved the closure and sale of the Main Street block to LDS Church subject to certain conditions. In the process leading to approval, the Planning Commission recommended that the City Council approve the sale contingent on several conditions that reflected the Commission's concern with ensuring public access and allowing public expression on the pedestrian plaza. The suggestions included a recommendation that the City retain a perpetual pedestrian easement "planned and improved so as to *maintain, encourage, and invite public use*" and "[t]hat there be no restrictions on the use of this space that are more restrictive than is currently permitted at a public park." Aplt. App. vol. III at 1220 (emphasis added).

The ordinance the City Council adopted retained only some of these conditions. The first recommendation, that the City retain an easement for public

-5-

use "planned and improved so as to maintain, encourage, and invite public use,"
was a condition of the ordinance as approved by the City Council. *Id.* vol. I at
191. In addition, the Council suggested during its meeting that the City retain a
right of reverter to the property to ensure that the Church met these conditions, in
particular providing public access. *See id.* vol. II at 401. However, the latter
condition, that the plaza be regulated no more strictly than a public park, was
omitted from the ordinance.

The City subsequently recorded a Special Warranty Deed and Reservation
of Easement conveying the Main Street surface property to the Church. The
reservation allows only non-speech conduct on the easement and also specifically
prohibits a number of expressive activities. The reservation of easement reads:

> 1.3 <u>Pedestrian Access and Passage</u>: Subject to the conditions, limitations,
> and restrictions set forth in section 2 hereinbelow, Grantor reserves an
> easement over and across the surface of the Property for pedestrian access
> and passage only . . . . Grantee shall not erect any perimeter fences or
> gates on the Property along the North Temple or South Temple rights of
> way . . . . Grantor may allow the general public to use this easement for
> pedestrian access and passage only, but all use of this easement shall be
> subject to the conditions, limitations, and restrictions described
> hereinbelow.

*Id.* vol. I at 361. The reservation contains the following restrictions with respect
to the use of the easement:

> 2.2 <u>Right to Prevent Uses Other Than Pedestrian Passage</u>: Nothing in the
> reservation or use of this easement shall be deemed to create or constitute a
> public forum, limited or otherwise, on the Property. Nothing in this
> easement is intended to permit any of the following enumerated or similar

-6-

activities on the Property:  loitering, assembling, partying, demonstrating, picketing, distributing literature, soliciting, begging, littering, consuming alcoholic beverages or using tobacco products, sunbathing, carrying firearms (except for police personnel), erecting signs or displays, using loudspeakers or other devices to project music, sound or spoken messages, engaging in any illegal, offensive, indecent, obscene, vulgar, lewd or disorderly speech, dress or conduct, or otherwise disturbing the peace. Grantee shall have the right to deny access to the Property to persons who are disorderly or intoxicated or engaging in any of the activities identified above.  The provisions of this section are intended to apply only to Grantor and other users of the easement and are not intended to limit or restrict Grantee's use of the Property as owner thereof, including, without limitation, the distribution of literature, the erection of signs and displays by Grantee, and the projection of music and spoken messages by Grantee.

*Id*. at 362.  The reservation gives the LDS Church the right to exclude anyone who has previously engaged in any of the above conduct while using the easement (the "Habitual Violator" provision).  The City also reserved utility easements, access for emergency and police vehicles, and a view corridor which restricts the erection of buildings on the plaza.  Finally, as suggested by the City Council, the reservation contains a Right of Reverter providing that if "Grantee fails to use the Property for the purposes set forth herein, or fails to maintain the Property thereafter," ownership may revert to the City.  *Id*.

At its own expense, the Church reconstructed the former street and sidewalks, making the area an attractive plaza that fits seamlessly into the Church's downtown campus.  There are paved walking areas interrupted by planters, benches, and waterfalls, a large reflecting pool, and changes in grade. The Church uses the plaza for religiously-oriented exhibits, dissemination of

information, and special events, as well as for the entrance to the Temple Square.

While the Church now refers to the area as an ecclesiastical park, prior to the sale when asked how it would further the public interest, the Church variously described the proposed Main Street Plaza as "a pedestrian-friendly area," "a funnel to the Crossroads and ZCMI Center shopping malls as well as the remainder of the downtown business district," and "a downtown pedestrian plaza," and stated the plaza would "provide a public environment," "enhance the urban fabric of the downtown area," "emphasize Main Street as a primary pedestrian walkway," and "assist Main Street, which is the heart of the shopping area, to become the most pedestrian oriented street in Salt Lake City." *Id.* vol. IV at 1584-89.

Plaintiffs, which include First Unitarian Church of Salt Lake City, Utahns for Fairness, Utah National Organization of Women, and Craig Axford, filed this action challenging the sale and the easement restrictions under the First and Fourteenth Amendments and similar provisions of the Utah Constitution. Specifically, plaintiffs asserted the restrictions are facially invalid because the entire plaza, or alternatively the retained easement, remains public property on which speech cannot be so restricted. They also claimed the City had delegated to the LDS Church the discretion to interpret and enforce the restrictions in violation of the Establishment Clause, and that the property transaction itself violated the

Establishment Clause because it included the challenged restrictions. They

further contended the restrictions violate the Equal Protection Clause because

they discriminate between the Church and members of the public. Plaintiffs

sought declaratory and injunctive relief.

The suit named the City as defendant and the LDS Church was permitted to

intervene. All parties filed cross-motions for summary judgment.[2] After a

hearing, the district court granted defendant's and intervenor's motions for

summary judgment on all claims and denied plaintiffs' motion. The court

determined that the physical characteristics, use, and purpose of the property had

fundamentally changed after the sale and development of the plaza, and concluded

that the easement was no longer a public forum.[3] The court then held that the

easement is government property that "could be considered a nonpublic forum."

146 F. Supp.2d at 1174. The court nonetheless held that the restrictions are

reasonable because the property would not otherwise have been sold and because

the prohibited activities are incompatible with the property's new purpose, an

_____

[2] Plaintiffs moved for partial summary judgment on only their claim that the restrictions on the easement are invalid under the free speech clause of the First Amendment. Our ruling in favor of plaintiffs on this issue nevertheless disposes of plaintiffs' remaining claims because they all rest on the existence of the easement restrictions, which we hold invalid.

[3] Plaintiffs stated in the hearing on summary judgment that they were abandoning their claim that the *entire* plaza is a public forum, and the district court accordingly ruled only on the easement.

ecclesiastical park. The court also held the restrictions do not constitute viewpoint discrimination because the LDS Church, as a private owner of the plaza property, has greater rights on the easement than members of the public.

With regard to the Establishment Clause claims, the district court held the restrictions do not delegate any municipal power to the Church because the Church was merely given the ability to enforce its rights as a private property owner. The court rejected the Establishment Clause challenge to the sale, holding the plaintiffs did not produce any evidence of collusion between the City and the Church and the sale did not otherwise violate the Establishment Clause. The court rejected the Equal Protection Claim on the ground that any discrimination between the Church and the public rationally reflected the Church's greater rights as the property owner.

## II

We review the grant of summary judgment de novo. *See Jurasek v. Utah State Mem. Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)). In applying

this standard, we review the factual record and all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Id.* If no genuine issue of material fact exists, we determine whether the district court properly applied governing substantive law. *Id.* Because First Amendment interests are involved, we have an obligation to conduct an independent review of the record and to examine constitutional facts and conclusions of law de novo. *Z.J. Gifts D-2, LLC v. City of Aurora*, 136 F.3d 683, 685 (10th Cir. 1998) (citing *Revo v. Disciplinary Bd.*, 106 F.3d 929, 932 (10th Cir. 1997)).

We may direct that judgment be entered in favor of any moving party we conclude is entitled to summary judgment on the record before us. *See id.* (citing *Dickeson v. Quarberg*, 844 F.2d 1435, 1444 n.8 (10th Cir. 1988) (court of appeals may grant summary judgment even to nonmoving party if "'the facts were fully developed at the summary judgment hearing so that the court of appeals can determine that the nonmoving party clearly was entitled to a judgment as a matter of law . . . and there is no procedural prejudice to the moving party.'") (quoting 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720)).

## A.

We consider first the free speech claim. The district court held *sua sponte* that plaintiffs' free speech claim was ripe only with respect to the prohibitions on

-11-

"demonstrating, assembling, picketing, distributing literature, erecting signs or displays, using devices to project spoken messages or music." *First Unitarian Church*, 146 F. Supp. 2d at 1163-65 (D. Utah 2001). This would preclude, for example, any attack on the prohibition against "engaging in any [ ] offensive . . . speech, dress or conduct." Aplt. App. vol. I at 362. On the contrary, however, we have no doubt plaintiffs' facial challenge to the entire set of restrictions is ripe. Significantly, it is not particular restrictions contained in the deed that are at issue because the City and the Church claim that the easement is private property and that there are no public speech rights whatsoever on it. The Church thus asserts plenary authority to regulate speech on the easement. *See* Aplt. App. vol. IV at 1382-83 (Plaza security policy). The City similarly maintains that "the easement does not allow any speech at all from those using the easement." Aple. App. at 44; *see also* Def./Aple. Br. at 22, 26, 40, 41. The issue is therefore whether the City has the authority to prohibit all expressive activities on a public easement it reserved across otherwise private property, except for the speech permitted by the private owner of the underlying estate. Because plaintiffs have asserted the intention to use the easement for expressive activity and the Church and City assert the Church is empowered to prevent any such activity, we easily conclude plaintiffs' facial claim is ripe as to the entire prohibition of speech, dress, or conduct on the pedestrian easement.

Plaintiffs contend the easement is a public forum because it has the characteristics of a public sidewalk, a traditional public forum. They also argue the easement has substantially the same characteristics, use, and purpose as the Main Street sidewalks the easement replaced and it therefore remains a public forum notwithstanding the City transferred legal title to the LDS Church. Alternatively, plaintiffs contend the easement as retained by the City is public property and is therefore at least a nonpublic forum for which the speech restrictions are neither reasonable nor viewpoint-neutral.

The City and LDS Church maintain the easement cannot be a public forum because the property's character, use, and purpose have changed sufficiently to eliminate any public forum that existed before the street was sold, and because the City expressly disavowed any intent to create or continue a public or limited forum. They also argue the easement itself cannot be government property subject to forum analysis because the scope of the easement does not include speech activities, and because an easement is an insufficient government property interest to trigger First Amendment limitations.

As an initial matter, we address the argument advanced by the City and LDS Church that the First Amendment cannot apply to the easement according to its terms because the reservation is for "pedestrian passage only" and expressly excludes speech activities. The parties contend the Church cannot be required to

-13-

permit speech activities on the easement because this would exceed the scope of the property interest created by the reservation.

We agree that the reservation of easement on its face defines the easement to exclude expressive activities. However, a deed does not insulate government action from constitutional review. *See* RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 3.1 cmt. d (2000) (easements to which government is party are subject to the Constitution). If government actions taken with respect to the easement violate the Constitution, this simply means the easement terms themselves are unconstitutional and must be altered or eliminated by the involved property owners.

We next address the central contention of the City and LDS Church that the easement is not "government property" and First Amendment forum principles therefore do not apply at all. *See generally Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672 (1998) (determining initially whether "public forum principles apply . . . at all" to public broadcasting). The City and Church claim that because an easement is not a possessory interest in land and the Church continues to hold title to the underlying property burdened by the easement, the easement is not "government property" subject to forum analysis.

We do not disagree with the technical characterization of easements as nonpossessory property interests, *see* RESTATEMENT (THIRD) OF PROP.:

SERVITUDES § 1.2. However, forum analysis does not require that the government have a possessory interest in or title to the underlying land. Either government ownership or regulation is sufficient for a First Amendment forum of some kind to exist. *See United States v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981) (applying forum principles to privately owned mailboxes "controlled by the government"); *see also Marsh v. Alabama*, 326 U.S. 501, 505 (1946) (title to property not necessarily determinative of public speech rights on property); *Venetian Casino v. Local Joint Executive Bd.*, 257 F.3d 937, 945 n. 6 (9th Cir. 2001) (sidewalks need not be government owned to constitute public fora).

Indeed, forum analysis does not require the existence of government property at all. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800-01 (1985) (rejecting argument that forum analysis requires "tangible government property" or even a "physical situs" for the forum) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Therefore, whether we characterize the easement as a property interest belonging to the government, or as property owned by a private party but burdened by the government, the First Amendment may still apply.

The City and LDS Church similarly argue that easements cannot be subject to forum analysis because they do not constitute a significant enough property interest. We disagree. Government condemnations of easements are takings

under the Fifth Amendment and entitle the grantor to compensation. *See Dolan v. City of Tigard*, 512 U.S. 374 (1994) (public easement required as a condition of development permit is a taking requiring compensation); *see also Colman v. Utah State Land Bd.*, 795 P.2d 622 (Utah 1990) (easements are property rights protected under the Utah Constitution from government takings without due process); *Hayes v. Gibbs*, 169 P.2d 781 (Utah 1946) (same).  Easements are therefore constitutionally cognizable property interests.[4]

Finally, holding that an easement cannot be a forum would lead to the conclusion that many public streets and sidewalks are not public fora.  Public highways or streets are often easements held for the public, with title to these property interests remaining in abutting property owners.

> Highways and streets are public property only in the sense that they are
> subject to public use . . . . As a rule, and whether a highway is established

---

[4] The LDS Church also contends that permitting public speech on the easement would constitute a taking of its property.  *But see generally PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) (rejecting mall owner's claim that state law requiring him to permit speech at his mall was a Fifth Amendment taking of his property).  Essentially the Church's claim is that speech would "take" a larger estate than the easement.  Our answer is the same as our answer above addressing the argument that the free speech claim is precluded by the narrow scope of the easement itself:  the issue before us is whether it is constitutionally permissible for the City to retain a pedestrian easement but prohibit expressive conduct on that easement.  If we conclude it is not, it is up to the City and the Church to modify their property transaction so the actions of the City conform to the Constitution.  Any claim that a potential solution to this problem, which may or may not be attempted, would itself present other constitutional problems is speculative and not before us.

by dedication or prescription, or by the direct action of the public authorities, *the public acquires merely an easement of passage*, the fee title remaining in the landowner.

39 AM. JUR. 2D *Highways, Streets, & Bridges* §§ 182-83 (1999) (emphasis added) (citations omitted); *see also M.B.M., Inc. v. George*, 655 F.2d 530, 532 (3rd Cir. 1981) ("At common law, ownership of land used as a highway belongs to the abutting landowner, subject to the public's right to use the road."); *Southwestern Bell Tel. Co. v. State Corp. Comm'n*, 664 P.2d 798, 800 (Kan. 1983) (public highways only grant easement to public; title remains in abutting property owner).

Public streets are "the archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). Because such traditional public fora are often easements, it is evident the property here is not exempt from the First Amendment merely because it is an easement rather than land to which the government holds fee title.[5] "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515

---

[5] We hold only that the mere fact the government has an easement rather than fee title does not defeat application of the First Amendment. We are not holding the converse, that the First Amendment applies to all easements. Whether or not a particular government easement warrants application of forum principles will depend on the characteristics of the easement, the practical considerations of applying forum principles, and the particular context the case presents. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-77 (1998).

(1939) (Roberts, J., concurring); *see also Venetian Casino*, 257 F.3d at 943-45 & n.6 (applying forum analysis to city easement for sidewalk on private property); *Thomason v. Jernigan*, 770 F. Supp. 1195, 1197 (E.D. Mich. 1991) (adjudicating public speech rights on municipal right-of-way reserved by easement on private property). Accordingly, we reject the argument that the government easement cannot be a First Amendment forum of any kind.

**B.**

Having decided forum principles apply to the easement, we proceed to analyze this case under those principles. The extent to which government may control expressive activities depends on the nature of the relevant forum. *Cornelius*, 473 U.S. at 800.

The Supreme Court has identified three types of forums, "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Forbes*, 523 U.S. at 677 (quotations and citations omitted). "Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or government fiat,' the property has been 'devoted to assembly and debate.'" *Id*. (quoting *Perry Educ. Ass'n*, 460 U.S. at 45). Designated public fora are created by "purposeful government action, . . . by intentionally opening a nontraditional public forum for public discourse." *Id*.

Other property is either a nonpublic forum or not a speech forum at all. *Id.*

Plaintiffs assert the easement is a public forum because it has all the characteristics of sidewalks, which are traditional public fora "without more." *Grace*, 461 U.S. at 177 (1983). They also assert the easement is a public forum because it is essentially the same sidewalk that ran along the former Main Street, which was unquestionably a public forum. The City and LDS Church respond that the easement cannot be a public forum because of express language in the reservation of easement stating the space does not constitute a public forum. They also argue the physical characteristics of the former Main Street have been changed sufficiently by development of the plaza to eliminate any public forum that existed along the former Main Street.

We first reject the contention that the City's express intention not to create a public forum controls our analysis. The government cannot simply declare the First Amendment status of property regardless of its nature and its public use. *See Forbes*, 523 U.S. at 678 ("traditional public fora are open for expressive activity *regardless of the government intent*") (emphasis added); *Grace*, 461 U.S. at 180 (the government's own "*ipse dixit*" does not determine the First Amendment status of property); *see also Int'l Soc'y for Krishna Consciousness v. Lee (ISKON),* 505 U.S. 672, 694 (1992) (Kennedy, J., concurring in judgment) (First Amendment doctrine should not "grant[] the government authority to

-19-

restrict speech by fiat."). It is only with respect to designated fora that the Supreme Court's forum analysis has focused on whether there has been "purposeful government action" creating a forum "in a place not traditionally open to assembly and debate." *Forbes*, 523 U.S. at 677; *see also Cornelius*, 473 U.S. at 802 (examination of whether charity drive among federal employees created designated public forum, focusing on "policy and practice" of government as well as objective nature of forum); *Hawkins v. City & County of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999) ("The designated public forum . . . is one a state creates by intentionally opening a *non-traditional* forum for public discourse.") (quotation and citation omitted) (emphasis added); *cf. United States v. Kokinda*, 497 U.S. 720, 738 (1990) (Kennedy, J., concurring in judgment)[6] (objective factors have "more force here *than in those instances where the Government created a nontraditional forum to accommodate speech for a special purpose.*" (citing *Perry Educ. Ass'n*, 460 U.S. 37, and *Cornelius*, 473 U.S. 788)) (emphasis added). Examples of designated public fora include "state university meeting facilities expressly made available for use by students, . . . school board meetings open to the public by state statute, . . . advertising space in state-owned subway

_____

[6] We cite Justice Kennedy's concurrence as controlling Supreme Court precedent because his concurrence provided the fifth vote on the narrowest grounds. *See Hawkins v. Hargett*, 200 F.3d 1279, 1982 (10th Cir. 1999) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

and commuter rail stations, . . . [and] a city owned and operated senior center sponsoring lectures." *Hawkins*, 170 F.3d at 1287 (quotations and citations omitted).

In contrast, for property that is or has traditionally been open to the public, objective characteristics are more important and can override express government intent to limit speech. *See Kokinda*, 497 U.S. at 738 (Kennedy, J., concurring) (legitimate justifications for restrictions notwithstanding, "other factors may point to the conclusion that the Government must permit wider access to the forum than it has otherwise intended."); *id.* at 737-38 ("[C]ertain objective characteristics of Government property and its customary use by the public may control the case."). As Justice Kennedy wrote for a majority in *Forbes*, "public fora are defined by the objective characteristics of the property." *Forbes*, 523 U.S. at 677. This is not to say the government has automatically created a public forum by opening property to the public, *Grace*, 461 U.S. at 177, but if it has so opened the property, objective characteristics determine whether it is a public forum.

Justice Kennedy elaborated on what he meant by examining objective characteristics to determine if property is a public forum in his concurrence in *ISKON*:

> If the objective, physical characteristics of the property at issue and the actual public access and uses that have been permitted by the government indicate that expressive activity would be appropriate and compatible with those uses, the property is a public forum. The

most important considerations in this analysis are whether the property shares physical similarities with more traditional public forums, whether the government has permitted or acquiesced in broad public access to the property, and whether expressive activity would tend to interfere in a significant way with the uses to which the government has as a factual matter dedicated the property."

*ISKON*, 505 U.S. at 698-99 (Kennedy, J., concurring in judgment). We apply these factors to assess the easement's character for First Amendment purposes.

To determine the easement's nature and purpose, the question we address is whether expressive activity is compatible with the purposes and uses to which the government has lawfully dedicated the property, not whether the government has expressly designated speech as a purpose of the property. *See ISKON*, 505 U.S. at 686 (O'Connor, J., concurring)[7] (examining whether public access is "'inherent in the open nature of the locations.'" (quoting *Kokinda*, 497 U.S. at 743 (Brennan, J., dissenting))); *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 576 (1987) (invalidating statute for prohibiting "[m]uch nondisruptive speech – such as the wearing of a T-shirt or button that contains a political message – *[which] may not be 'airport related' but is still protected speech even in a nonpublic forum."*) (emphasis added).

The actual purpose and use of the easement here is a pedestrian throughway for the general public. This is not merely the use which the City has in practice

---

[7] Justice O'Connor provided the fifth vote on the narrowest grounds in this case. *See supra* note 6.

permitted, but also the express purpose for which the City retained the easement. The City's stated purposes for promoting and approving the overall project were to increase usable public open space in the downtown area, encourage pedestrian traffic generally, stimulate business activity, and provide a buffer closed to automobile traffic between the residential area to the north of the plaza and the business areas to the south.

The easement has particular public importance for the City because of the role the City envisioned the easement playing in the character and development of downtown Salt Lake City. While the City wanted to close the street to automobile traffic, it simultaneously wanted to preserve and indeed encourage pedestrian traffic. The easement through the plaza was specifically retained in order to preserve and enhance the pedestrian grid in the downtown. The City points out that developing pedestrian malls by closing downtown streets has been a stated goal of various long-range City plans for almost forty years. Aplt. App. vol. I at 214, 224, 228. As the City itself asserts, the easement was a necessary means of accomplishing these public purposes even as it sold the underlying property to the LDS Church.

Moreover, the City's actions approving the sale and the resulting property ownership structure were specifically designed to ensure these aims were accomplished, and the pedestrian easement was central to these goals. The

-23-

ordinance the City Council passed approving the street closure and sale – the City's necessary legislative act for closing and selling a public street – was expressly contingent on several conditions. The first of these was that the City retain a perpetual pedestrian easement "planned and improved so as to *maintain, encourage, and invite public use*." *Id.* vol. I at 191 (emphasis added). In addition, the reservation of easement contains a right of reverter in favor of the City that provides the property will revert to the City if the LDS Church "fails to use the Property for the purposes set forth" in the deed and easement. *Id.* at 362. In its meeting approving the ordinance, the City Council requested the City administration to negotiate a right of reverter in the deed specifically to ensure the plaza would be kept open for public use as promised. *Id.* vol. II at 401. Finally, the City has contended throughout this litigation that the City would not have agreed to the sale "but for" the easement.[8] *See, e.g.*, Aple. App. at 61. These circumstances indicate the easement is infused with public purposes even broader than providing a pedestrian walkway.

The City and Church contend the purpose of the easement is solely for ingress and egress to Church facilities. They produced evidence in the district

---

[8] Indeed, the City and Church disagree as to the effect of holding the restrictions unconstitutional. The City contends this would eliminate the restrictions but not the easement; the Church contends the government would lose the easement. *See* Aple. App. at 61, 68.

court that the vast majority of users were those with Church business or tourists whose end destination was the plaza itself or various Church facilities. This argument is at odds with the publicly and legislatively stated purposes of the easement noted above. In addition, to the extent individuals with Church business enter onto the plaza, it is not clear they are actually using the easement because they are not utilizing the plaza for "pedestrian passage" and presumably the Church would permit those with Church business to enter the plaza in the absence of the easement. In other words, providing access to those with Church business is more properly characterized as a Church purpose, and does not capture the actual or articulated purpose of the easement, a pedestrian walkway for the public at large.

Similarly, the City and Church argue that not all walkways are sidewalks, and that the easement here is more similar to the walkways at issue in *Hawkins* than to a public sidewalk that is a traditional public forum. We agree that not all walkways are traditional public fora, but because the purpose of the easement is not limited to ingress and egress to Church facilities, but is intended rather for pedestrian passage, it is distinguishable from those walkways that have been held not to be public fora.[9] In *Hawkins*, we held that walkways within the Galleria, a

_____

[9] Although the City and Church argue the easement does not meet the legal definition of "sidewalk" and therefore should not be referred to as such, the label
(continued...)

partially open area leading to the Denver Performing Arts Complex (DPAC), were

not public fora. *Hawkins*, 170 F.3d at 1287-88. In reaching that holding, we

reasoned

> [t]he Galleria does not qualify as a traditional public forum, for it is *not . . . analogous to a public right of way or thoroughfare. The Galleria does not form part of Denver's automotive, bicycle or pedestrian transportation grid*, for it is closed to vehicles, and *pedestrians do not generally use it as a throughway to another destination.* Rather, the Galleria's function is simply to permit ingress to and egress from the DPAC's various complexes.

*Id.* at 1287 (emphasis added). Similarly, a plurality of the Supreme Court held in

*Kokinda* that the sidewalks leading to a post office were not public fora because

they led only from the post office parking lot to the post office building, and their

sole purpose was to provide ingress and egress to the post office. *Kokinda*, 497

U.S. at 727 (plurality opinion of O'Connor, J.) ("[t]he postal sidewalk at issue

does not have the characteristics of public sidewalks" because it is not a "public

passageway" or "thoroughfare" but "leads only from the parking area to the front

---

[9](...continued)
is not dispositive. In addressing whether the walkways at issue in *Kokinda* were public fora, the Supreme Court made no distinction between "sidewalk" and "walkway." *See, e.g., United States v. Kokinda*, 497 U.S. 720, 727-29 (1990); *see also Greer v. Spock*, 424 U.S. 828, 830-36 (1976) (referring to "public streets" within military reservation). The plurality's public fora determination in *Kokinda* turned instead on the nature and purpose of the sidewalks. *See Kokinda*, 497 U.S. at 727-29 (plurality opinion) (post office "sidewalk" is nonpublic forum). Therefore our analysis does not depend on whether the walkways are properly referred to as "sidewalks," but on the purpose to which they are dedicated.

door of the post office. . . [and] was constructed solely to provide for the passage of individuals engaged in postal business."); *see also Greer v. Spock*, 424 U.S. 828 (1976) (streets and sidewalks on military reservation are not public fora because they are entirely within the compound and the military has unquestioned authority to control activity on military bases); *Chicago ACORN v. Metro. Pier & Exposition Auth.*, 150 F.3d 695, 702 (7th Cir. 1998) (sidewalks on the pier are not traditional public fora because they "are not through routes; they lead only to the pier facilities themselves.").

The purpose of the easement in this case is for pedestrian passage, it forms part of the downtown pedestrian transportation grid, and it is open to the public. The easement therefore shares many of the most important features of sidewalks that are traditional public fora. This similarity is a persuasive indication that the easement is a traditional public forum. *See ISKON*, 505 U.S. at 698-99 (Kennedy, J., concurring in judgment) (whether property shares physical similarities with traditional public forums is one of most important factors in defining public fora); *see also Frisby*, 487 U.S. at 480 ("'[T]ime out of mind' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." (quoting *Hague*, 307 U.S. at 515 (Roberts, J., concurring)); *Grace*, 461 U.S. at 177 ("public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are

considered, *without more*, to be public forums." (quotation and citation omitted) (emphasis added)). The easement here is thus better compared to the easement which the Ninth Circuit held was a public sidewalk, and therefore a traditional public forum, in *Venetian Casino*, 257 F.3d at 944 ("[T]he sidewalk is used to facilitate pedestrian traffic along the Las Vegas strip generally and not merely to provide access to the Venetian for its patrons.").

We also consider whether speech activities are compatible with the purpose of the easement. *See ISKON*, 505 U.S. at 698-99 (Kennedy, J., concurring in judgment). In doing so, we presume the availability of reasonable time, place, and manner restrictions, so we do not consider "theoretical incompatibilities" that could be avoided. *Id*. at 699. Moreover, it is the purpose of the easement, the property that is a forum of some type, and not the purpose of the Church plaza, the surrounding property, that is at issue.[10]

Expressive activities have historically been compatible with, if not virtually inherent in, spaces dedicated to general pedestrian passage. *See, e.g., ISKON*, 505 U.S. at 686 (O'Connor, J., concurring) (determining whether airport is public forum by examining whether public access is "inherent" in the open nature of the

---

[10] In this respect, the district court erred in considering whether speech activities were compatible with an "ecclesiastical park." Providing for a religious park is the purpose of the surrounding plaza property, not the easement, and must be the Church's purpose, rather than the City's.

location). Given that the easement shares most of the characteristics of a traditional public sidewalk, which is an "archetype" public forum, *Frisby*, 487 U.S. at 480, it is implausible that *all* speech activities (which is what the City purports this easement prohibits) would practically interfere with the use of the easement for pedestrian passage. *See, e.g., Lederman v. United States*, 291 F.3d 36, 43 (D.C. Cir. 2002) ("If people entering and leaving the Capitol can avoid running headlong into tourists, joggers, dogs, and strollers . . . then we assume they are also capable of circumnavigating the occasional protester."). We also note the City itself first proposed requiring the Church to regulate speech on the plaza no more restrictively than a public park. In short, it is evident that the use of this property, which is similar to a traditional public sidewalk, is compatible with expressive activities.

The City and Church assert any expressive conduct by the public would interfere with the character of the surrounding private property, the Church's private property rights on the easement, and the Church's own ability to communicate. Protecting the Church's expression from competition is not a legitimate purpose of the easement or its restrictions, so we do not consider its compatibility with speech. *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 85-87 (1980) (requiring shopping center owner to permit public speech does not infringe on owner's free speech rights). With respect to the other arguments,

to the extent they relate to the purpose of the easement rather than the surrounding property, the effects of expressive activity such as congestion, noise, and disruption within reasonable limits are the necessary cost of securing our First Amendment freedoms and these effects must be tolerated to a reasonable extent. *ISKON*, 505 U.S. at 701 (Kennedy, J., concurring in judgment) ("The First Amendment is often inconvenient. But that is beside the point. Inconvenience does not absolve the government of its obligation to tolerate speech."). Therefore, although a government may always enforce, at a minimum, reasonable time, place, and manner restrictions on public expression, a desire for peace and order does not support a conclusion that a public space such as this is not a public forum.[11]

---

[11] In this regard, having determined that the easement warrants the application of First Amendment principles, and recognizing it has the characteristics of traditional public sidewalks, we do not believe the special nature of this particular pedestrian passageway – that it traverses private property rather than abuts a public street – defeats its status as a public forum. The Supreme Court has made clear that once an "archetype" of a public forum has been identified, it is not appropriate to examine whether special circumstances would support downgrading the property to a less protected forum. *Frisby v. Schultz*, 487 U.S. 474, 481 (1988). The Court rejected the argument that public streets that are narrow and located in quiet residential neighborhoods are therefore not public fora, stating "[n]o particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora. Accordingly, the streets of Brookfield are traditional public fora." *Id*; *see also ISKON*, 505 U.S. at 697 (Kennedy, J., concurring in judgment) ("open, public spaces and thoroughfares that are suitable for public discourse may be public forums, . . . without concern

(continued...)

-30-

Finally we consider the history of the property. Whether property has traditionally been open to public use is a factor indicating the property is a public forum, although this is not determinative. *See Grace*, 461 U.S. at 179. The property here is undisputedly open to public use.

A more important factor is whether the property has traditionally been the site of expressive activities by the public. *See Forbes*, 523 U.S. at 677 (factors such as "whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate'" determine whether property is public forum) (quoting *Perry Educ. Ass'n*, 460 U.S. at 45); *Grace*, 461 U.S. at 178 (areas traditionally held open for expressive activities are normally public fora). The government previously permitted public expression in this area when it was a public sidewalk abutting Main Street, but it has not ever permitted public expression on the easement. We give no weight to the fact that the government has not "traditionally" permitted speech activities since it sold the property and retained the easement. Where courts have considered the traditional use of publicly accessible property for speech, they have refused to attribute legal significance to an historical absence of speech activities where that non-speech history was created by the very restrictions at issue in the case. *See Grace*, 461

---

[11](...continued)
for a precise classification of the property."); *Grace*, 461 U.S. at 177 (sidewalks are normally public fora "without more").

U.S. at 180 ("Government may not by its own "*ipse dixit*" destroy public forum status); *Lederman*, 291 F.3d at 43 ("restrictions cannot bootstrap themselves into validity by their mere existence" (quotation, citation and emphasis omitted)). This is particularly true where the property was a public forum before the government restrictions were put in place. As the Supreme Court stated in *Grace*,

> Traditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts [] property that has been dedicated to a use other than as a forum for public expression. Nor may the government transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property.

*Grace*, 461 U.S. at 180.

This raises the issue of the relevance of the easement's prior history, as public sidewalks, to our analysis. The plaintiffs argue, more generally, that the easement remains a public forum precisely because the property was previously a public forum and it has not been sufficiently altered to destroy that status. The City and Church contend significant changes in the physical characteristics and use of the property have eliminated any prior public forum. The mere fact that a space is on what used to be a public street does not automatically render it a public forum. *See Hawkins*, 170 F.3d at 1287 ("'In some sense the government always retains authority to close a public forum, by selling the property, changing its physical character, or changing its principal use.'" (quoting *ISKON*, 505 U.S.

at 699-700) (Kennedy, J., concurring in judgment))).

The district court concluded that both the physical characteristics and the principal use of the property had been altered sufficiently to eliminate the previous public forum. We disagree that the principal use of the easement has changed. As we previously stated, the district court considered the religious purpose of the plaza when it should have considered the purpose of the easement. The purpose of the easement is to provide a pedestrian throughway that is part of the city's transportation grid, and in this respect it is identical to the purpose the sidewalks along that portion of Main Street previously served. Similarly, to the extent the walkways provide access to the Church facilities as an end destination for tourists, which is another stated purpose of the easement, the former sidewalks along Main Street similarly provided tourists with the means of accessing portions of the Church campus open to them. In *Hawkins*, the court found that the walkways had changed sufficiently not only because they served a different purpose – ingress and egress to the DPAC facilities – but also because their physical nature was different, that is, they dead-ended at DPAC rather than remaining part of the city's pedestrian grid. *Id*. Here, while certain physical characteristics of the walkways have changed, they are still intended to provide passage through, not to, Church property.

As stated above, a pedestrian throughway was the primary purpose to which

-33-

the City expressly dedicated the easement. The previous public street and sidewalks provided access between these two city blocks, were part of the city's transportation grid, served this function in a central downtown location, and were highly desirable because of the large size of city blocks in downtown Salt Lake City. It was clearly the intent of the City to retain these aspects of the previous space with respect to pedestrians. In addition, the ordinance approving the street closure required an easement "planned and improved to *maintain . . . public use*." Aplt. App. vol. II at 401 (emphasis added). The City therefore deliberately retained the pedestrian throughway that existed before it closed the street.

In retaining the easement, the City not only retained the most important functions of the property, but also the functions most often associated with speech activities. *See, e.g., Hawkins*, 170 F.3d at 1288. Thus, while the government has the power to change the status of a forum, "when property is a protected public forum the State may not by fiat assert broad control over speech or expressive activities; it must alter the objective physical character or uses of the property, *and bear the attendant costs*." *ISKON*, 505 U.S. at 700 (Kennedy, J., concurring in judgment) (emphasis added); *see also Hawkins*, 170 F.3d at 1287-88 (to eliminate public forum state must alter physical characteristics and bear attendant costs) (quotation and citation omitted). We are convinced the City has attempted to change the forum's status without bearing the attendant costs, by retaining the

-34-

pedestrian easement but eliminating the speech previously permitted on the same property. In effect, the City wants to have its cake and eat it too, but it cannot do so under the First Amendment.

"As society becomes more insular in character, it becomes essential to protect public places where traditional modes of speech and forms of expression can take place." *Kokinda*, 497 U.S. at 737-38 (Kennedy, J., concurring in judgment). We think this is particularly true with respect to downtown public spaces conducive to expressive activities. The prior history of the easement here is highly relevant to whether the property has traditionally been open to public speech. Because the property was a public forum prior to the sale, we conclude the retained easement has traditionally been open to speech activities.

In sum, the easement's history, as well as the other contemporary characteristics of the easement discussed above, support the conclusion that the easement is a public forum. The objective nature and purpose of the easement and its similarity to other public sidewalks indicate it is essentially indistinguishable from other traditional public fora. We reach this conclusion in spite of the City's express intent not to create a public forum, because the City's declaration is at odds with the objective characteristics of the property and the City's express purpose of providing a pedestrian throughway. Accordingly, we hold that the easement is a public forum.

## C.

We turn to whether the restrictions on speech activities on the easement are valid.  In a traditional public forum, the government's power to restrict expressive conduct is "very limited."  *Grace*, 461 U.S. at 177.

> For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.  The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Perry Educ. Ass'n*, 460 U.S. at 45 (citation omitted).  In public fora, "the government may not prohibit all communicative activity."  *Id.*

The "restrictions" here virtually ban speech because, as we pointed out above,  the City and LDS Church maintain that the public has no speech rights whatsoever on the easement except as the Church may permit, which amounts to the same thing.  As such, the restrictions are invalid.  *Id.*  The Supreme Court has held such broad bans invalid even under a nonpublic forum analysis.  *See Bd. of Airport Comm'rs*, 482 U.S. at 574-75 (invalidating ban on all "First Amendment activity" at LAX airport).  As Justice O'Connor wrote for a unanimous court:

> On its face, the resolution at issue in this case reaches the universe of expressive activity, and, by prohibiting *all* protected expression, purports to create a virtual "First Amendment Free Zone" at LAX.  The resolution does not merely regulate expressive activity in the Central Terminal Area that might create problems such as congestion or the disruption of the activities of those who use LAX.  Instead, the

> resolution . . . prohibits even talking and reading, or the wearing of
> campaign buttons or symbolic clothing. Under such a sweeping ban,
> virtually every individual who enters LAX may be found to violate
> the resolution by engaging in some "First Amendment activit[y]."
> We think it obvious that such a ban cannot be justified even if LAX
> were a nonpublic forum because no conceivable governmental
> interest would justify such an absolute prohibition of speech.

*Id.* at 574-75. The City has similarly attempted to create a "First Amendment Free Zone" on the easement and this attempt too must fail.

The City contends that acquiescing to the LDS Church's demand to control speech on the easement was necessary to obtain the Church's agreement to buy the property. That may be true, but the City may not exchange the public's constitutional rights even for other public benefits such as the revenue from the sale, and certainly may not provide a public space or passage conditioned on a private actor's desire that that space be expression-free. The City must "'bear the attendant costs.'" *Hawkins*, 170 F.3d at 1288 (quoting *ISKON*, 505 U.S. at 700 (Kennedy, J., concurring in judgment)). If it wants an easement, the City must permit speech on the easement. Otherwise, it must relinquish the easement so the parcel becomes entirely private.

The City and Church maintain they may legitimately seek to protect the Church and the sanctity of its property from public speech. This is true to a certain extent. As with any public forum, the City may enact reasonable time, place, and manner restrictions. *See Perry Educ. Ass'n*, 460 U.S. at 45.

-37-

Governments routinely pursue public objectives in regulating the time, place and manner of speech on public fora without running afoul of the Constitution. Such legitimate objectives include public safety, accommodating competing uses of the easement, controlling the level and times of noise, and similar interests. *See*, *e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 792 (1989) (government desire to "retain the character of the [park] . . . and to avoid undue intrusion into residential areas and other areas of the park" justify noise level restrictions in public park); *Frisby*, 487 U.S. at 484-86 (interest in "residential privacy" justifies ban on targeted picketing of particular houses). Thus while the purpose of the forum is a pedestrian easement, the City may take the interests of surrounding property owners into account in enacting regulations, and may seek to accommodate competing uses of the easement.

We are not insensitive to the multitude of activities that occur in any downtown setting and the competing property uses at issue here, particularly given that the Church is the primary anchor of interest in the property. But the City may not take action that runs afoul of our first and primary amendment. Our Country's dedication to both free expression and non-Establishment are among its greatest heritages, and our fealty to the concept of a marketplace of ideas in religion as well as other fields has been the hallmark of our society. Moreover, we remind the City that "[t]he First Amendment is a limitation on government,

not a grant of power." *ISKON*, 505 U.S. at 695 (Kennedy, J., concurring in judgment). The City's attempt to create a public throughway but withhold speech rights on that throughway is ineffectual simply because the City has attempted to exercise power the First Amendment does not afford.

## III

Because we hold the easement restrictions invalid, we need not reach the plaintiffs' remaining federal or state claims. The LDS Church does, however, raise two further arguments we must address. The Church asserts that granting the relief plaintiffs' request would entangle the City in joint administration of the easement with the Church in violation of the Establishment Clause. We are not persuaded. We hold here that the City, not the Church, has responsibility for regulating speech on the easement. While the City may legitimately accommodate the unique location and setting of the easement, to the extent the City overly involves the Church in that regulation it will run afoul of the limits on its actions we announce today.

The LDS Church also claims that permitting public speech on the easement would infringe on the Church's right of free expression. We also reject this contention because the Church has no First Amendment right to be protected from public speech. The speech of others does not, as a matter of law, infringe on an

individual's own free speech rights. *See PruneYard Shopping Center*, 447 U.S. at 85-87 (free speech rights of shopping mall owner not infringed upon by state law requiring owner to permit speech in mall).

Our conclusions in this case do not depend on any facts in dispute. Accordingly, summary judgment for plaintiffs is appropriate. *Z.J. Gifts D-2, LLC*, 136 F.3d at 685 (citing *Dickeson*, 844 F.2d at 1444-45 n.8). Plaintiffs are entitled to declaratory and injunctive relief with respect to the ban on expressive conduct on the easement.

## IV

For the reasons stated above, we **REVERSE** the judgment of the district court and **REMAND** with instructions to enter judgment for plaintiffs consistent with this opinion.[12]

---

[12]Appellee's "Motion to Strike" filed August 27, 2001, by the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints is denied.