Eric **VERLO, Janet Matzen, and Fully Informed Jury Association,** Plaintiffs,

v.

Chief Judge Michael **MARTINEZ, in his** official capacity as chief judge of the Second Judicial District, Defendant.

Civil Action No. 15–cv–1775–WJM–MJW

United States District Court, D. Colorado.

Signed 07/27/2017

Andrew Joseph McNulty, David Arthur Lane, Killmer, Lane & Newman, LLP, Denver, CO, for Plaintiffs.

Corelle M. Spettigue, Matthew David Grove, Stephanie Lindquist Scoville, W. Eric Kuhn, Colorado Attorney General's Office, Denver, CO, for Defendant.

## FINAL FINDINGS OF FACT & CONCLUSIONS OF LAW

William J. Martinez, United States District Judge

Plaintiffs Eric Verlo, Janet Matzen, and the Fully Informed Jury Association ("FIJA") (collectively, "Plaintiffs") bring this lawsuit to establish that they have a First Amendment right to distribute and discuss literature regarding jury nullification on the exterior grounds of Denver's Lindsey–Flanigan Courthouse ("Courthouse"). (ECF Nos. 1, 13–1.) The Courthouse is where most criminal proceedings take place for Colorado's Second Judicial District (which is coterminous with the City and County of Denver).

The only remaining defendant in this case is the Hon. Michael A. Martinez in his official capacity as Chief Judge of the Second Judicial District. Out of recognition that Plaintiffs' lawsuit does not target Chief Judge Martinez himself but rather a policy promulgated by the Second Judicial District through Chief Judge Martinez, the Court will refer below to Chief Judge Martinez as "the Second Judicial District," unless the context requires otherwise.

This Court previously granted a preliminary injunction requiring the Second Judicial District to refrain from interfering with Plaintiffs' peaceful distribution of their jury nullification pamphlets, or with advocacy of the message contained in those pamphlets ("Preliminary Injunction"). (ECF No. 28.) This case then proceeded through discovery, and the Court held a Bench Trial on April 17 & 18, 2017, to determine whether to convert the Preliminary Injunction into a permanent injunction.

Under Federal Rule of Civil Procedure 52(a)(1), this Court is required to announce the result of the bench trial through written findings of fact and conclusions of law. This order provides those findings and conclusions. For the reasons explained below, the Court finds that the Preliminary Injunction should be dissolved and that judgment should enter in favor of the Second Judicial District.

## I. PUBLIC FORUM ANALYSIS, GENERALLY

Understanding everything below turns on understanding the Supreme Court's doctrine of First Amendment "forum analysis," which is a set of inquiries intended to resolve the extent to which the government can limit expressive activities on pub-

lic property. Much more will be said below about forum analysis, but at the outset it is helpful to understand the basic questions. Those questions are as follows:

1. Is the expression at issue protected by the First Amendment? If so—

2. Is the location at issue a "traditional public forum," a "designated public forum," or a "nonpublic forum"?

3. If the location is a traditional or designated public forum, is the government's speech restriction narrowly tailored to meet a compelling state interest?

4. If the location is a nonpublic forum, is the government's speech restriction reasonable in light of the purpose served by the forum, and viewpoint neutral?

*See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797–806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

## II. STANDING

The Court must first address Plaintiffs' standing to pursue this lawsuit, which goes to this Court's subject matter jurisdiction. *See Strich v. United States*, 793 F.Supp.2d 1238, 1246 n.1 (D. Colo. 2011) ("The Court has an independent and continuing duty to determine whether subject matter jurisdiction exists."). Framing the standing question requires a relatively lengthy account of how this case began and how it has transformed since then.

### A. Early Proceedings & the Preliminary Injunction

Plaintiffs' original complaint was filed against the City and County of Denver and its police chief in his official capacity (together, "Denver"). (ECF No. 1.) The complaint was motivated by the pending prosecution of two activists, Eric Brandt and Mark Iannicelli, whom the State of Colorado had accused of jury tampering by handing out jury nullification literature in front of the Courthouse. (*Id.* ¶¶ 14–19.) Plaintiffs wished to engage in similar jury nullifica-

tion advocacy in front of the Courthouse, but feared prosecution, given Brandt's and Iannicelli's experience. (*Id.* ¶¶ 20–22.) On the same day they filed their complaint, Plaintiffs also moved for a preliminary injunction. (ECF No. 2.)

Two days later, Plaintiffs amended their complaint ("Amended Complaint") to add the Second Judicial District as a defendant and to set forth allegations regarding a Second Judicial District administrative order recently posted on the Courthouse doors. (ECF No. 13-1 ¶ 2.) The order, designated "CJO 15-01" and dated August 14, 2015, was titled "Chief Judge Order Regarding Expressive Activities at the Lindsey–Flanigan Courthouse." (ECF No. 24-1.) This order was amended on August 21, 2015, hours before the preliminary injunction hearing in this Court, and was admitted as an exhibit in the preliminary injunction hearing. (*See* ECF No. 25-1.) The same document was admitted as Defendant's Exhibit A in the April 2017 bench trial whose outcome is currently under consideration, and the Court will refer to it as the "Plaza Order." As discussed in detail below, the Plaza Order prohibits most expressive activities in a specified geographic area leading up to the Courthouse's two public entrances (the "Restricted Area"). Plaintiffs, in their Amended Complaint, alleged their belief that the Plaza Order was entered in response to Brandt's and Iannicelli's actions. (ECF No. 13-1 ¶ 2.)

One day before the preliminary injunction hearing, Plaintiffs and Denver submitted a joint stipulation ("Stipulation") that the Courthouse Plaza (comprising the Restricted Area and certain additional surroundings) "is a public forum and any content-based regulations must be narrowly drawn to effectuate a compelling state interest and reasonable time, place and manner regulations." (ECF No. 23 ¶ 1.) Plain-

tiffs and Denver further stipulated "that Plaintiffs' proposed intent of peacefully handing out jury nullification literature to or discussing jury nullification with passersby at the Plaza, without more, does not violate Colorado law." (*Id.* ¶ 2.) And finally, as relevant here, Denver stipulated that "that it does not intend to enforce the [Second Judicial District's Plaza Order] as written and will only impose content and viewpoint neutral reasonable time, place and manner restrictions on the use of the Plaza, and/or other exterior areas surrounding the Plaza if Denver determines that a compelling need exists to do so." (*Id.* ¶ 4.) In other words, Denver had essentially taken sides with Plaintiffs against the Second Judicial District on this matter.

Determined to make lemonade out of this lemon, the Second Judicial District then contended that Plaintiffs lacked Article III standing to sue because no threat of enforcement was imminent. (ECF No. 24 at 6–8.) *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("the irreducible constitutional minimum of standing" includes, among other things, an "actual or imminent" "invasion of a legally protected interest"); *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009) (to obtain prospective relief, a plaintiff must show a "credible threat of future prosecution").

In its order following the preliminary injunction hearing, this Court rejected the standing argument, finding that there still remained a possibility that the Second Judicial District itself could attempt to enforce the Plaza Order:

The Second Judicial District's standing argument assumes that the only way an individual could run afoul of the Plaza Order is through Denver's independent enforcement efforts. But Chief Judge Martinez, and perhaps any other judge in the Second Judicial District, could issue a contempt citation for violating the Plaza Order. *Cf. Schmidter v. State*, 103 So.3d 263, 265–69 (Fla. Dist. Ct. App. 2012) (distributor of FIJA literature convicted of contempt for violating an administrative order similar to the Plaza Order). The violator would then be required to appear before the issuing judge, and if he or she fails to appear, an arrest warrant can issue. *See* Colo. R. Civ. P. 107(c). Denver may then be obligated to arrest the violator—not on the authority of the Plaza Order, but on the authority of the judge's contempt citation. *See id.* (requiring the sheriff to carry out the arrest). The Court takes judicial notice of the fact that Colorado state law enforcement officers, not subject to Denver's stipulation, could also effect the arrest of such a hypothetical violator.

Thus, the Court finds that Article III standing still exists. . . .

*Verlo v. City & Cnty. of Denver*, 124 F.Supp.3d 1083, 1090 (D. Colo. 2015)("*Verlo I*").

The Court then went on to the question of "whether Denver or the Second Judicial District speaks for the First Amendment status of the Courthouse Plaza." *Id.* at 1093. This was important because, as noted above (Part I), the degree of scrutiny to which this Court must subject First Amendment restrictions turns on whether public property is, on the one hand, a traditional or designated public forum (requiring strict scrutiny), or, on the other hand, a nonpublic forum (requiring a less-strict reasonableness evaluation).

The Court found that Plaintiffs were likely to succeed in proving that Denver controls the First Amendment status of the Courthouse Plaza; and in turn likely to succeed in proving, based on the Stipulation, that the Courthouse Plaza was "at least a designated public forum," making

any First Amendment restrictions subject to strict scrutiny. *Id.* at 1092–93. Moreover, the Second Judicial District had not argued for application of the reasonableness test applicable to nonpublic fora, instead resting on the position that the Plaza Order could survive strict scrutiny regardless of the Courthouse Plaza's proper forum designation. *See id.* at 1093 (citing ECF No. 24 at 9). The Court therefore applied strict scrutiny and found that the portion of the Plaza Order limiting expressive activity failed that test, and therefore violated the First Amendment. *Id.* at 1094–95. The Court further found that the remaining preliminary injunction factors favored the Plaintiffs, and therefore enjoined the offending portion of the Plaza Order as it related specifically to Plaintiffs' intended jury nullification advocacy. *Id.* at 1095–96. The Court did not enjoin portions of the Plaza Order regarding obstructing entryways, erecting tents or other structures, or using sound amplification equipment. *Id.* at 1096.

## B. The Appeal

The Second Judicial District appealed the Preliminary Injunction to the Tenth Circuit. In a published opinion, the Tenth Circuit affirmed, finding that the Second Judicial District had waived (for purposes of that appeal) any argument that the Restricted Area was a nonpublic forum, and that this Court had correctly found that Plaintiffs were likely to succeed in proving that the Plaza Order was unconstitutional. *See Verlo v. Martinez,* 820 F.3d 1113, 1130–38 (10th Cir. 2016) ("*Verlo II* "). Although the Tenth Circuit acknowledged in passing that Plaintiffs' Article III standing had been challenged below, *see id.* at 1130, the same standing argument apparently was never raised during the appeal. The Tenth Circuit concluded its opinion with some guidance regarding ways to handle, on remand, Denver's and the Second Judicial District's competing claims to the

Courthouse Plaza, assuming the Plaza remained at least a designated public forum by virtue of Denver's Stipulation. *Id.* at 1138–47.

## C. Denver's Dismissal

Shortly before the Tenth Circuit issued its *Verlo II* opinion, this Court granted Denver's motion to dismiss for lack of jurisdiction. (ECF No. 97.) The Court reasoned that the Stipulation rendered Plaintiffs' claims against Denver moot, and that any possibility that Denver might still somehow enforce the Plaza Order was too speculative to sustain standing. (*Id.* at 4–10.) The Court also adopted the Stipulation as an order. (ECF No. 98.)

## D. Denver's About–Face

A couple of months before trial, Denver and the Second Judicial District mended fences—at least on paper. In a February 2017 status report, the Second Judicial District announced that "Denver and the Judicial Branch ha[d] negotiated and reached an agreement that they have collaborative authority under state law to regulate the courthouse grounds." (ECF No. 134 at 4.) Attached to this status report was an unsigned "Memorandum of Understanding" ("MOU") between Denver and the Second Judicial District, apparently intended to formalize the new collaborative security relationship. (ECF No. 134-1.)

The Second Judicial District further announced that "the decision ha[d] been made"—apparently by itself and Denver—"to de-designate the Reserved Area of the plaza [as a public forum]." (ECF No. 134 at 5.) *Cf. Summum v. Callaghan,* 130 F.3d 906, 914 (10th Cir. 1997) ("Unlike a traditional public forum, the government is not required to indefinitely retain the open character of a designated public forum." (internal quotation marks omitted)). But, said the Second Judicial District, "[t]he

decision to de-designate is prospective only and is not intended to alter the Stipulation Denver entered into prior to the entry of the Preliminary Injunction in this case." (ECF No. 134 at 5.) Rather, Denver and the Second Judicial District preferred to wait for this Court's eventual ruling on the forum status of the Courthouse Plaza:

> Once that legal question is resolved, Denver and the Judicial Branch have agreed that they will collaborate to issue a new joint order [governing the Courthouse Plaza]. The new joint order will reflect the collaborative authority over the courthouse grounds, will supersede [the Plaza Order], and may alter the scope of some of the parameters of the [Plaza Order], although Denver and the Judicial Branch anticipate that the [restrictions on expressive activity] will remain substantially the same.

(*Id.*)

Given this status report and Denver's apparent intention eventually to withdraw its Stipulation, the Court ordered Denver to show cause why the Court should not reinstate Denver as a party. (ECF No. 136.) Denver responded, somewhat surprisingly, by first *denying* any intent to withdraw from the Stipulation (ECF No. 137 at 3) but then *affirming* that it had de-designated the Courthouse Plaza as a public forum "going forward" (*id.* at 5) and agreeing with the Second Judicial District that the Plaza Order "will be superseded by a substantially similar joint order after this Court has determined the forum status of the [Courthouse Plaza]" (*id.* at 6–7). Denver additionally reasoned, in essence, that its own actions were currently immaterial because Plaintiffs were arguing that the Courthouse Plaza was a traditional public forum—an argument which, if accepted by this Court, would mean that neither Denver nor the Second Judicial District could change the Plaza's forum status. (*Id.* at 3–4.) Thus, Denver resisted reinstatement in the case.

The Court gave both Plaintiffs and the Second Judicial District an opportunity to respond to Denver's position. (See ECF No. 136.) Plaintiffs filed nothing. The Second Judicial District, for its part, agreed with Denver that Denver's presence in this lawsuit was unnecessary: "However Plaintiffs choose to prove their case, neither the de-designation nor the Defendants' Memorandum of Understanding requires Denver's reinstatement as a party to resolve the continuing controversy between Plaintiffs and the Judicial Branch [over the Plaza Order]." (ECF No. 138 at 2.) The Court therefore discharged its order to show cause. (ECF No. 139.)

### E. Denver's Current Status

Ever since Denver realigned itself with the Second Judicial District, the Court has been somewhat confused about Denver's actual position in this litigation. Denver denies any intent to withdraw from the Stipulation—yet, assuming this Court finds the Courthouse Plaza to be other than a traditional public forum, Denver states that it and the Second Judicial District will jointly issue a new order substantially similar to the Plaza Order. One might wonder if Denver has somehow failed to realize that this new joint order alone would likely place it in contempt of this Court, and any attempt to enforce the new order would certainly place it in contempt.

The Court suspects, however, that Denver understands this and is currently attempting both to have and eat its cake. Denver managed to get itself dismissed from this lawsuit via the Stipulation and thereby avoid future liability for attorneys' fees, assuming Plaintiffs prevail. *See* 42 U.S.C. § 1988. Denver knows that if it withdraws the Stipulation before final judgment, it remains open to such liability. Denver therefore likely wants to stay on the sidelines looking in until this Court rules one way or the other.

This order, of course, is that ruling, and the Court rules in favor of the Second Judicial District. The Court therefore looks forward to whatever verbal gymnastics Denver will present when it either attempts to withdraw from the Stipulation (having denied any intent to withdraw from it) or to justify its conduct in contempt proceedings. But that is a matter for the future. Right now, what is clear is that all of the parties remain in functionally the same position as they were during the preliminary injunction proceedings: Denver is on the sidelines, and the dispute remains solely between Plaintiffs and the Second Judicial District.

### F. "Separate Sovereigns"

■ Thus the standing question returns, and the bench trial and subsequent research has re-confirmed this Court's prior conclusion that the Second Judicial District retains contempt authority to enforce the Plaza Order.

■ As to subsequent research, the Court is satisfied that a Colorado chief judge's administrative order may be enforced through contempt. *See, e.g., Bd. of Cnty. Comm'rs of Weld Cnty. v. Nineteenth Judicial Dist.*, 895 P.2d 545, 549 (Colo. 1995) ("The Chief Judge ordered security to maintain the court's existence. If the Sheriff failed to provide security, the Chief Judge had his contempt power, another facet of a court's inherent authority, to enforce his order....") ("*Weld Cnty.*").

As to evidence at the bench trial, there was some testimony from Chief Judge Martinez regarding why he has never taken any action to enforce the Plaza Order against non-enjoined behavior, such as use of sound amplification equipment. (*See* Trial Transcript ("Tr.") (ECF Nos. 164, 172) at 550–51.) Although the possibility of contempt was never mentioned, Chief Judge Martinez at times seemed to deny that he

had ability to take action. (*See, e.g.*, Tr. at 551 ("I'm not a law enforcement officer. I don't have police power. I don't have a law enforcement or police force...."); *id.* at 556 ("...I don't have a law enforcement body that operates under my direction and control. I don't have a police force.").) Elsewhere, however, the Chief Judge made clear that his inaction was also motivated simply by a desire to avoid contempt proceedings in *this* Court. (*See, e.g.*, Tr. at 539 ("Q. Have you considered whether you could issue an order that permits jury nullification activists to distribute their literature but prohibits other types of expressive activities? A. I can't do that and it's got to be [a] content neutral circumstance. I mean, if I did that, then the next thing I would get is a challenge saying, You know, well, I want to be able to put my notice out, you know. You know, you're choosing them because you like them more."); *id.* at 575 ("...I have done my best over the—since the order was issued to comport with it, to follow it, and I respect this Court and the Court's authority and ability to issue the order."); *id.* at 578–79 ("I don't want to put our court in the position where we're disregarding this Court's order. I don't want to put my employees or my staff in that position."); *cf. id.* at 399 (testimony of the Hon. Lee Sinclair (ret.), expert witness in courthouse security for the Second Judicial District: "And I am—and I am going to be very, very leery of doing anything to in any way side-step or walk around that [preliminary injunction] order. This is a federal judge telling me something, I'm going to be extremely careful. And I just don't want to maybe buy more litigation at this point in time until I could have my whole matter heard.").) Thus, Chief Judge Martinez's testimony does not undermine this Court's conclusion that he possesses contempt authority, even if he has chosen not to use it.

A closely related aspect of the standing inquiry also requires discussion. The

Court's rulings up to this point, and particularly the Preliminary Injunction ruling (*Verlo I*), have assumed that if Denver designated the Courthouse Plaza as a public forum, then the Courthouse Plaza was a designated public forum for all purposes and from all perspectives. *See* 124 F.Supp.3d at 1093 ("The ultimate question, however, is whether Denver or the Second Judicial District speaks for the First Amendment status of the Courthouse Plaza."). Upon reflection and review of the entire record, the Court concludes that this assumption is too narrow in the present circumstances.

■ The Courthouse Plaza is actually governed by what may be deemed "separate sovereigns."[1] Denver is the landowner, but the Second Judicial District is a tenant with inherent authority to issue orders for preservation of security and decorum:

> The inherent powers which courts possess consist of all powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence, and integrity, and to make its lawful actions effective. These powers are inherent in the sense that they exist because the court exists; the court *is*, therefore it has the powers reasonably required to act as an efficient court.

*Peña v. District Court*, 681 P.2d 953, 956 (Colo. 1984) (internal quotation marks omitted; alterations incorporated; emphasis in original); *see also Weld Cnty.*, 895 P.2d at 548–49 ("...the Chief Judge

properly ordered security to ensure the continuing viability of the courts. Without security the public's confidence in the integrity of the judicial system is threatened. The proper administration of justice requires that courts operate in a safe and secure environment. When society views the security of the court system with skepticism, the authority of the judicial branch is diminished. A weak judicial branch prevents a proper functioning of the tripartite scheme of government. The Chief Judge properly ordered security so the courts may continue to fulfill their constitutional mandate and administer justice in an orderly and dignified atmosphere.").

Thus, Denver's choice not to withdraw from the Stipulation means that the Courthouse Plaza remains a designated public forum *as it relates to Denver's ability to impose restrictions on the property*. But it is manifest that Denver's Stipulation does not bind the Second Judicial District. And if the preliminary injunction hearing had been framed in these terms, the result might have been different—for, as the Court noted then, courthouse grounds are routinely deemed to be nonpublic fora. *See Verlo I*, 124 F.Supp.3d at 1093 n.5. However, no party (nor the Court) raised the question of whether "separate sovereigns" could each designate the forum status of the same piece of property for their own purposes, likely because it is a truly novel circumstance that none of us had considered possible.[2] Moreover, the Second Judicial District argued solely under the strict scrutiny test. Thus, the Court had no occa-

---

1. "Separate sovereigns" is probably too strong a term, given that neither Denver nor the Second Judicial District is "sovereign" as that word is normally used. But "co-equal branches of government" seems entirely inapposite—Denver and the Second Judicial District (or Denver and the Colorado judicial branch generally) are not "co-equal" under the Colorado Constitution. Thus, lacking a

better term, the Court will continue to use the language of "separate sovereigns."

2. In two years of litigation, neither the parties, nor this Court, nor the Tenth Circuit in *Verlo II*, located a First Amendment case presenting competing governmental claims to the same piece of property. *See, e.g., Verlo II*, 820 F.3d at 1144 ("This argument between Defen-

sion to consider seriously the possibility that the Courthouse Plaza was a nonpublic forum as it relates to the Second Judicial District's separate enforcement authority.

After further consideration, this Court concludes that it may appropriately determine the forum status of the Courthouse Plaza as it relates to the Second Judicial District's ability to impose restrictions on the property. That is the framework and purpose of the following Findings and Conclusions.

## III. FINDINGS OF FACT

Having listened attentively to each witness; having carefully judged each witness's credibility; and having reviewed the trial transcript, the exhibits admitted into evidence, and the parties' proposed findings and conclusions (ECF Nos. 170 & 171), the Court finds as follows:

## A. The Courthouse Grounds Generally

1. The Courthouse opened for operations in 2010. (Plaintiffs' Trial Exhibit ("PX") 4 at 58.) [3]

2. From above, the Courthouse and its grounds appear as follows, save for yellow highlighting which was added to this aerial photograph by the Second Judicial District and which will be discussed further below:

dants raises difficult and novel questions about the intersection between a government property owner's power to designate its property as a public forum and the rights of the occupant of the government property—in this case another governmental entity—to use that property without interference."). In dicta, *Verlo II* offers an extended discussion of how this Court might approach the problem. *See id.* at 1144–47. The Tenth Circuit's ultimate recommendation, drawing on decisions regarding designated public fora, is to inquire whether Denver's Stipulation was some sort of insincere designation, possibly "motivated by fiscal or other considerations" and operating "so intrusively that the essential function of the Courthouse is thwarted." *Id.* at 1147. In candor, the Court disagrees that this would be an appropriate approach. The cases cited by *Verlo II* in this regard are cases where a government was attempting to *avoid* a court finding that it had created a designated public forum, and the court therefore inquired whether the government's historic practice with respect to the contested forum showed that the government's current litigation position was merely a smokescreen for an intent to *suppress* the free speech activities that led to the lawsuit. *Compare id.* at 1147 (citing cases) *with id.* at 1143 (discussing those same cases in terms of "post hoc justification[s] for a desire to suppress a particular message"). There is simply no case law which addresses a governmental entity designating a public forum—a *speech-enhancing* act—to the potential detriment of

another governmental entity. And whatever detriment that might be, it is not a First Amendment issue. Although First Amendment doctrine attempts to accommodate a government's needs (*e.g.,* preserving the purposes of the Courthouse) as against *citizens* challenging speech restrictions, it has nothing to say about one government entity stepping on another's toes. *See, e.g.,* 1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 3:13 (Apr. 2017 update) ("The Free Speech Clause operates as a negative restraint against government regulation that restricts the speech of private persons and entities. The Free Speech Clause does not instill in governmental units themselves any free speech rights. Subordinate units of government, such as cities, counties, or public school districts, are deemed 'creatures of the state' and do not possess free speech rights that can be asserted against the state government that created them."). Rather, this a question of inter- and intragovernmental rights under state and municipal law. Here, fortunately, the Court's "separate sovereigns" finding eliminates any need to delve further into this obscure jurisprudence.

3. PX 4 is a transcript containing multiple sets of non-matching page numbers. In this order, the Court cites to the page numbers in the upper right-hand corner, which were apparently the original page numbers created when the court reporter finalized the transcript.

(Defendant's Trial Exhibit ("DX") A at 3.) The Court has annotated this photograph with borders and labels, for ease of reference:

3. It is generally known within this Court's territorial jurisdiction that: the top of the photograph is north; the Courthouse itself is the irregularly shaped, white-roofed building occupying the left half of the photograph; immediately to the left (west) of the Courthouse is Fox Street; immediately to the north is Colfax Avenue; and immediately to the south (not depicted) is Fourteenth Avenue. *See* Fed. R. Evid. 201(b)(1), (c)(1).

## B. The West Side of the Courthouse Grounds

4. The west (Fox Street) side of the Courthouse features the West Sidewalk (a public sidewalk), which is crossed by driveways leading to two sally ports for entry of official vehicles into the Courthouse. (Tr. at 561, 563, 580–81.)

5. The west side also features the West Entrance, which is a public entrance but is

very lightly used, and usually only by employees. (Tr. at 340–41, 419, 561, 565.)

## C. The East Side of the Courthouse Grounds

6. On the opposite (east) side of the Courthouse grounds is Elati Street, which is closed to traffic other than official vehicles as it runs past the Courthouse. (Tr. at 52–53.)

7. Another helpful photograph of the east side of the Courthouse grounds, this one from the north looking generally south, is reproduced below (again, with labels and arrows inserted by the Court for ease of reference):

(Excerpt from DX H.)

8. Elati Street bisects the Circular Plaza, an area paved in a salmon color. (*Id.*)

9. The west half of the Circular Plaza is mostly framed by two areas of Landscaping, one larger and one smaller. (DX A.)

10. Running along the west side of the larger Landscaping area is the Arced Walkway, which comprises a series of shallow steps leading from the Colfax Avenue side of the Courthouse grounds up to the Patio. (PX 2; DX A, E, H.)

11. The Arced Walkway is often closed during the colder months of the year due to slip-and-fall concerns. When closed, it is sometimes used for snow storage. (Tr. at 54, 212–13, 465.)

12. Even when the Arced Walkway is open, few passersby notice its existence, and so it is rarely used. (Tr. at 82, 166–67, 337.)

13. Running west from the Arced Walkway to the outer wall of the Courthouse itself is the Gravel Area, which is a passive security feature. (Tr. at 361; PX 4 at 48–49.)

## D. The Patio

14. The southern end of the Arced Walkway and Gravel Area forms the northern end of the Patio, which is also framed by the two Landscaping areas, the Main Entrance, the Glass Wall (the outer wall of the Jury Assembly Room), the Lunch Area (a gravel area with picnic tables), and the East Sidewalk. (Tr. at 162–63; DX A, G, H.)

15. The Patio is separated from the East Sidewalk by a line of low metal bollards, followed by three steps down to the East Sidewalk itself. (Tr. at 164–65; DX H.)

16. The Patio is separated from the Circular Plaza by the Landscaping and by what the parties have described as "concrete bollards." (Tr. at 431.) These are not traditional bollards, but are instead long rectangular blocks through which a pedestrian must navigate, like "staggered walls." (Tr. at 447, 449–50.) These blocks are about 40 feet from the Main Entrance. (Tr. at 359.)

17. The Patio is at a slightly higher elevation than the neighborhood's surrounding sidewalks; hence the steps up from the East Sidewalk and the shallow steps that form the Arced Walkway. The Circular Plaza also gradually slopes upward from Elati Street to the Patio. (Tr. at 426–27, 451.)

18. The Patio contains the Area of Repose, a set of three circular planters surrounded by curved benches, which David Tryba (the master urban design architect for the Courthouse) intended to be an area "to accommodate private conversations between family members who need to be consoled or who are getting prepared to go into a process that most people are unfamiliar with." (Tr. at 427.)

19. Pedestrians intending to walk from Fourteenth Street to Colfax Avenue, or vice versa, almost never do so by crossing through the Patio and Arced Walkway. Rather, they walk along Elati Street and through the Circular Plaza. Nearly every person who enters the Patio or Arced Walkway, by contrast, does so to reach the Courthouse's Main Entrance. (Tr. at 342–43, 467.)

### E. Architectural Intent

20. Tryba designed the Patio to be architecturally integrated with the Courthouse itself, and to function as an extension of the Courthouse's lobby. (Tr. at 432, 433.)

21. Tryba's further intent for the Patio was to create "a key transitional and arrival space...so that people can get prepared, as they enter a building with such consequences," thus "maintaining the dignity of the process." (Tr. at 426, 427.)

22. The architectural elements signaling the intended sense of transition include the raised grade of the Patio and the shallow upward motion needed to reach it (a substitute for a monumental staircase that was not feasible on the particular plot of land); the bollards; the increased quality of the building materials and landscaping; and the difference in the color and texture of the Patio's concrete as compared the surrounding walkways. (Tr. at 426–27, 432–33, 444, 445, 446–47, 449–50, 451–52.)

### F. The Jury Assembly Room

23. The Patio and the Courthouse's Jury Assembly Room are immediately adjacent, separated by the Glass Wall, which runs southeast from the Main Entrance to the Jury Assembly Room's easternmost corner, and then continues toward the Lunch Area for a few more feet. (DX A, H.)

24. Individuals on the Patio can see through the Glass Wall into the Jury Assembly Room, and they can be heard through the Glass Wall as well, if they speak loudly enough. (Tr. at 284, 500–04.)

### G. The Detention Center

25. Immediately east of the portion of Elati Street running past the Courthouse is Denver's Van Cise–Simonet Detention Center ("Detention Center"), as depicted in the following photograph, which was taken from the south looking north: [4]

4. Despite the location of the Google–inserted

"Lindsey–Flanigan Courthouse" label in this

(Excerpt from DX G.)

## H. The Courthouse's Operations

26. It is generally known within this Court's territorial jurisdiction that both the Second Judicial District and the Denver County Court occupy the Courthouse. *See* Fed. R. Evid. 201(b)(1), (c)(1).

27. The Second Judicial District hears only felony cases in the Courthouse. (Tr. at 531.)

28. Up to 750 potential jurors are summoned to the Courthouse each Monday and Tuesday, and another 200 jurors are summoned each Wednesday. (Tr. at 167.)

29. Due to discounted parking south of Fourteenth Street, almost all jurors approach the Courthouse by walking up the East Sidewalk from the south and then ascending the three steps that lead up to the metal bollards and finally onto the Patio. (Tr. at 74, 169, 291–92.)

30. A queue of 200 to 300 potential jurors may form outside the Main Entrance as they wait to get through the security screening process that occurs just inside the Main Entrance. (Tr. at 463.)

31. When a queue forms outside the Main Entrance, it sometimes extends directly away from the Main Entrance and onto the Circular Plaza, and at other times it curves past the Area of Repose and then onto the East Sidewalk. (Tr. at 170; DX A38, A46.)

32. Once potential jurors make it into the Jury Assembly Room, they receive an orientation and Chief Judge Martinez addresses them about the seriousness of their duties. (Tr. at 185, 492–93.)

## I. The Plaza Order

33. During the summer of 2015, the Courthouse was the site of a capital murder trial, *People v. Dexter Lewis*. (Tr. at 494–95; PX 4 at 36–37.)

34. During the course of the *Lewis* trial, racially-charged civil unrest had taken place in cities such as Baltimore, Maryland, and Ferguson, Missouri. In addition, the Arapahoe County capital murder trial of James Holmes (the Aurora theater shooter) had concluded with a sentence of life in prison, rather than death. Chief Judge Martinez's awareness of these events prompted a concern that the Courthouse grounds needed stricter behavioral

photograph, the Courthouse is the building on the left and the Detention Center is the building on the right; Elati Street runs down the middle. According to the Second Judicial District, the official name for the entire area between the Courthouse in the Detention Center is the Dale Tooley Plaza. (ECF No. 144 at 1.)

standards to ensure the Courthouse's essential functions. In particular, Chief Judge Martinez and his security staff worried about the public's possible reaction if Lewis (who is black) received a death sentence in contrast to Holmes (who is white). (Tr. at 494–95; PX 4 at 38.)

35. Chief Judge Martinez accordingly issued the Plaza Order, a general administrative order for the Second Judicial District that reads as follows (as amended August 21, 2015):

> The Court has the responsibility and authority to ensure the safe and orderly use of the facilities of the Second Judicial District; to minimize activities which unreasonably disrupt, interrupt, or interfere with the orderly and peaceful conduct of court business in a neutral forum free of actual or perceived partiality, bias, prejudice, or favoritism; to provide for the fair and orderly conduct of hearings and trials; to promote the free flow of pedestrian and vehicular traffic on sidewalks and streets; and to maintain proper judicial decorum. Those having business with the courts must be able to enter and exit the Lindsey–Flanigan Courthouse freely, in a safe and orderly fashion and unhindered by threats, confrontation, interference, or harassment. Accordingly, the Court hereby prohibits certain expressive activities on the grounds of the Courthouse, as depicted in the highlighted areas of the attached map, without regard to the content of any particular message, idea, or form of speech.
>
> **Prohibited Activities:** The activities listed below shall be prohibited in the following areas: anywhere inside the Lindsey–Flanigan Courthouse, including courtrooms, corridors, hallways, and lobbies; the areas, lawns, walkways, or roadways between the Courthouse and public sidewalks and roads; and any areas, walkways, or roadways that connect public sidewalks and roads to Courthouse entrances or exits. This includes the Courthouse entrance plaza areas on the east and west sides of the Courthouse as depicted in the highlighted areas of the attached map.
>
> 1. **Demonstrating; picketing; protesting; marching; parading; holding vigils or religious services; proselytizing or preaching; distributing literature or other materials, or engaging in similar conduct that involves the communication or expression of views or grievances; soliciting sales or donations; or engaging in any commercial activity; unless specifically authorized in writing by administration;**
>
> 2. **Obstructing the clear passage, entry, or exit of law enforcement and emergency vehicles and personnel, Courthouse personnel, and other persons having business with the courts through Courthouse parking areas, entrances, and roadways to and from Courthouse and Courthouse grounds;**
>
> 3. **Erecting structures or other facilities, whether for a single proceeding or intended to remain in place until the conclusion of a matter; or placing tents, chairs, tables, or similar items on Courthouse grounds; except as specifically authorized in writing by administration; and**
>
> 4. **Using sound amplification equipment in a manner that harasses or interferes with persons entering or leaving Courthouse grounds or persons waiting in line to enter the Courthouse.**

(DX A at 1–2 (boldface in original).) [5]

---

5. To the extent needed, the Court will refer to the Plaza Order's numbered paragraphs by

36. The "attached map" referenced in the opening paragraph of Plaza Order is the aerial photograph reproduced at ¶ 2, above. The "highlighted areas" mentioned in that same paragraph are the yellow-colored areas to the east and west of the Courthouse itself—which this Court refers to collectively as the "Restricted Area."

37. The Plaza Order does not prohibit individuals approaching the Courthouse from wearing clothing with political messages, or discussing politics with others in the security queue. (Tr. at 533, 534.)

38. Before Chief Judge Martinez issued the Plaza Order, jury nullification activists Eric Brandt and Mark Iannicelli had been charged with jury tampering because they had been distributing jury nullification literature on Courthouse grounds. (Tr. at 30–35.)

39. When Chief Judge Martinez issued the Plaza Order, he had not been aware of either Brandt's or Iannicelli's prosecution. He had been generally aware of jury nullification activists' activities on the Courthouse Plaza, but those activities did not inform his decision to issue the Plaza Order. (Tr. at 495.)

## J. Events Following the Preliminary Injunction

40. This Court issued the Preliminary Injunction on August 25, 2015. (ECF No. 28.)

their number, e.g., "Paragraph 1 of the Plaza Order" (referring to the forms of prohibited

41. At some point soon after the Preliminary Injunction issued, the Second Judicial District posted the Plaza Order at the Main Entrance with Paragraph 1 blacked out. (Tr. at 49.)

42. On August 27, 2015, Dexter Lewis was sentenced to life in prison rather than death and no demonstrations regarding that outcome arose. (Tr. at 496.)

43. Although the immediate motivation for the Plaza Order had passed, Chief Judge Martinez chose to keep the Plaza Order in place because this Court's Preliminary Injunction had, in the intervening days, emboldened activists to descend on the Courthouse Plaza and aggressively advocate their causes in numerous ways. (Tr. at 496–97.) For example, activists began an Occupy–style camping protest in the Restricted Area (and in the Circular Plaza). (Tr. at 91–92, 249; DX A24.) These early protests even involved public defecation in the Landscaping, ostensibly as a form of protest against public bathroom restrictions. (DX J.)

44. Although it appears that the camping protest has ended, demonstrations regarding various causes have continued in the Restricted Area. For example:

(a) Demonstrators have paraded and sometimes skateboarded back and forth outside the Jury Assembly Room holding signs or flags. (Tr. at 176, 184, 283–84.) The following photograph depicts a man near the Area of Repose carrying a "Fuck Cops" flag:

expressive activity).

(Excerpt of DX A31.)

(b) Demonstrators have written messages in chalk in the Area of Repose (as in the above photograph), including messages immediately outside the Jury Assembly Room and therefore visible through the Glass Wall, as depicted in this photograph taken from inside the Jury Assembly Room:

(Excerpt from DX P.)

(c) Demonstrators have written chalk messages elsewhere in the Restricted Area, including coarse and demeaning messages, such as that depicted in the following three photographs taken just outside the Main Entrance on separate occasions:

(Excerpt from DX O.)

(Excerpt from DX A34.)

(Excerpt from DX A39.)

(d) Some demonstrators' chalk messages have addressed specific ongoing cases, as in the following photograph of chalk messages addressing the high-profile retrial of Clarence Moses–EL:

(Excerpt from DX A40; *see also* Tr. at 514–15.)

(e) Demonstrators have used the benches in the Area of Repose to set up fake headstones, as depicted in this photograph:

(Excerpt from DX R.)

(f) Demonstrators have donned costumes and put on skits, as depicted in this photograph taken just outside the Main Entrance:

(Excerpt from DX A9.)

(g) Demonstrators have shouted their messages, sometimes through mega-phones, including while standing "right up against" the Glass Wall when jurors are present in the Jury Assembly Room. (Tr. at 188–90, 287–88, 500–05.)

(h) Demonstrators have played loud music or simply turned on the siren fea-ture of a megaphone for minutes at a time. (Tr. at 179, 500.)

45. Demonstrators' shouting, noise-making, and other attention-grabbing ac-tivities have frequently distracted jurors during their orientation. (Tr. at 185–86, 200, 500–05.)

46. As for jury nullification pamphle-teers such as Plaintiffs, they have often spoken in friendly tones when first ap-proaching a potential target of their mes-sage, but at times they have become "com-bative" and "nasty" when their literature is refused. (Tr. at 173.)

47. By coincidence, Tryba (the archi-tect) was called for jury service at the Courthouse sometime in the six months before the Bench Trial. While standing in the security queue, a demonstrator screamed at him and put a sign directly in front of his face. (Tr. at 436–37.)

48. Insistent jury nullification pam-phleteers will sometimes follow individuals right up to the Main Entrance and open the door for those individuals. (Tr. 214, 238.) Chief Judge Martinez personally ex-perienced this treatment as he approached the Courthouse on one occasion after de-clining a pamphlet. The pamphleteer re-peatedly asked Chief Judge Martinez to take a pamphlet, while a woman dressed "in a costume like a convict" stood directly in front of Chief Judge Martinez while "back-stepping as [he was] walking to-wards the [Main Entrance]." When Chief Judge Martinez arrived at the Main En-trance, he reached for the door handle but the woman grabbed it first and opened the door for him. (Tr. at 497–98.)

49. Demonstrators have learned to rec-ognize Courthouse employees and have frequently shouted vulgar and combative messages at those employees. Some em-ployees have begun to fear for their safety, and employee morale has declined. (Tr. at 188–89, 192–93, 250–52, 508–12.)

**K. Plaintiffs' Preferred Location**

50. Plaintiffs' have advocated for jury nullification almost exclusively on the Pa-tio, because that is where Plaintiffs can reach the vast majority of prospective ju-rors and others with court business as they approach the Courthouse and stand

in the security queue. (Tr. at 46–47, 77–79, 121, 171–72, 284, 459–60.)

51. The only time Plaintiff Matzen has attempted to reach individuals at the West Entrance was when the Main Entrance was closed for construction. (Tr. at 294.)

## IV. CONCLUSIONS OF LAW

### A. The Forum Analysis Standard

■ As explained at the outset, whether Plaintiffs have a First Amendment right to engage in the activities prohibited in the Restricted Area by the Plaza Order requires this Court to engage in a "forum analysis," comprising the following questions:

1. Is the expression at issue protected by the First Amendment? If so—

2. Is the location at issue a traditional public forum, a designated public forum, or a nonpublic forum?

3. If the location is a traditional or designated public forum, is the government's speech restriction narrowly tailored to meet a compelling state interest?

4. If the location is a nonpublic forum, is the government's speech restriction reasonable in light of the purpose served by the forum, and viewpoint neutral?

*Cornelius*, 473 U.S. at 797–806, 105 S.Ct. 3439.

There is no dispute that Plaintiffs wish to engage in expression protected by the First Amendment, so the Court will not provide any separate analysis of the first question. In addition, Plaintiffs contend that the Restricted Area—the only portion of the Courthouse Plaza affected by the Plaza Order—is a traditional or designated public forum (*i.e.*, designated by Denver), and have not asserted in the alternative

that the Plaza Order fails the reasonableness test applicable to a nonpublic forum. (*See* ECF No. 110 at 5–6 (Final Pretrial Order); ECF No. 154–1 (pretrial proposed Conclusions of Law); ECF No. 170 at 11–16 (post-trial proposed Conclusions of Law).) Thus, to the extent the Court finds that the Restricted Area is not a traditional or designated public forum, the Court need not further analyze the Plaza Order under a reasonableness standard.

### B. Sorting Out the Proper Approach to Traditional Public Forum Analysis

Plaintiffs' primary argument is that the Restricted Area is a traditional public forum. (*See id.* at 12–14.) Although the Court has made numerous findings of fact, above, there remains the question how many of those findings are relevant to determining whether the Restricted Area is a traditional public forum. As the following analysis will hopefully make clear, Supreme Court and Tenth Circuit case law have consistently shown that applying or stripping the "traditional public forum" label from a particular public space requires very little fact-finding because traditional public fora comprise an essentially fixed set of historically determined categories: public streets, public sidewalks, and public parks.[6]

However, one unusual Tenth Circuit decision, *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114 (10th Cir. 2002), suggests a much more detailed analysis that does not comport with the decisions both preceding and following it. Yet the parties here frame their proposed conclusions of law in terms of the factors discussed in *First Unitarian*. (*See* ECF No. 144 at 18; ECF No. 170 at 12, 14; ECF No. 171–1 at 13.)

---

**6.** As discussed in Part IV.B.13, below, other courts have extended this category to open areas abutting legislative and executive buildings.

Thus, the Court must sort out what the proper inquiry really is. A survey of relevant case law is helpful to this process.

### 1. *Perry* (1983)

The first clear statement of the Supreme Court's current "forum analysis" approach to public spaces came in *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), a dispute about restrictions on a particular union's ability to place circulars and other communications in teachers' school mailboxes. *See id.* at 40–41, 103 S.Ct. 948. The Supreme Court began its analysis by describing the three forum types into which the school mailboxes might be classified:

In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions....

A second category consists of public property which the state has opened for use by the public as a place for expressive activity. The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place....

Public property which is not by tradition or designation a forum for public communication is governed by different standards.

*Id.* at 45–46, 103 S.Ct. 948 (internal quotation marks omitted). This language plainly frames the "traditional public forum" question specifically in terms of "tradition," "long tradition," and even "time out of mind"—in contrast to designated public fora ("public property which the state has opened for use by the public as a place for expressive activity") and nonpublic fora ("[p]ublic property which is not by tradition or designation a forum for public communication"). The Court in *Perry*, however, had no need to apply its tradition analysis to the school mailboxes because the parties agreed that those mailboxes did not fall into the "traditional" category. *Id.* at 46 & n.8, 103 S.Ct. 948.

### 2. *Grace* (1983)

About two months after deciding *Perry*, the Supreme Court released another forum-analysis opinion, *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). *Grace* is of particular interest in this lawsuit because it was a challenge to a federal statute that banned political advocacy on the grounds of the United States Supreme Court building in Washington, D.C. *Id.* at 172–73, 103 S.Ct. 1702. However, the challengers limited their attack to the application of that statute on the public sidewalks surrounding the Supreme Court grounds; they did not challenge the statute's application to, *e.g.*, the plaza in front of the main entrance. *Id.* at 173–75, 103 S.Ct. 1702.

In *Grace*, the Court's description of the various types of fora was less precise than in *Perry*. Similar to (and citing) *Perry*, *Grace* stated that " 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.' " *Id.* at 177, 103 S.Ct. 1702. But in contrast to *Perry*, *Grace* never explicitly distinguished traditional from designated public fora. Nonetheless, the concept was certainly in the Court's mind when it later declared that "whether the property has been 'generally opened to the public' is a factor to consider in determining whether the government

has *opened its property to the use of the people for communicative purposes.*" *Id.* (emphasis added). And this phrasing is significant, given its suggestion that how the government has treated a particular public space should only be relevant if a potential designated public forum is at issue.

In any event, *Grace* did not need to engage in such an inquiry because a public sidewalk is already considered a traditional public forum:

> The sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington, D.C., and we can discern no reason why they should be treated any differently. Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property.

*Id.* at 179, 103 S.Ct. 1702 (footnote omitted). As will become important below, the Supreme Court went on to note specifically that "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* at 180, 103 S.Ct. 1702. The Court accordingly declared the relevant statute unconstitutional as applied to the sidewalks surrounding the Supreme Court grounds. *Id.* at 183–84, 103 S.Ct. 1702.

### 3. *Cornelius* (1985)

Two years after *Perry* and *Grace*, the Supreme Court handed down the previously-cited *Cornelius* decision. *Cornelius* was a dispute over which types of organizations the federal government could exclude from soliciting funds through "the Combined Federal Campaign (CFC or Campaign), a charity drive aimed at federal employees." 473 U.S. at 790, 105 S.Ct. 3439. *Cornelius* has little to say about traditional public fora, other than that "[p]ublic streets and parks fall into this category." *Id.* at 802, 105 S.Ct. 3439. Having said as much, the Court immediately went on to the designated public forum category, and expounded at length on factors relevant to determining whether such a designated forum had been created. *Id.* at 802–04, 105 S.Ct. 3439. In particular, the Court noted that it had previously "looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," and it had "also examined the nature of the property and its compatibility with expressive activity to discern the government's intent." *Id.* at 802, 105 S.Ct. 3439. Applying these inquiries, the Court held that the CFC was a nonpublic forum.

What is most interesting about *Cornelius* for present purposes is the lack of any suggestion that the "policy and practice of the government" and the "nature of the property and its compatibility with expressive activity" have anything to do with a *traditional* public forum analysis. This will become significant in the context of later decisions.

### 4. *Frisby* (1988)

The next relevant decision is *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), a dispute over a Brookfield, Wisconsin, ordinance that "completely ban[ned] picketing 'before or about' any residence." *Id.* at 476, 108 S.Ct. 2495. The picketing in question involved anti-abortion protesters "picketing on a public street outside the Brookfield residence of a doctor who apparently perform[ed] abortions at two clinics in neighboring towns." *Id.* The Supreme Court's

emphatic affirmance of those public streets as traditional public fora is notable for its reliance on basic categorical analysis:

> The relevant forum here may be easily identified: [the picketers] wish to picket on the public streets of Brookfield. Ordinarily, a determination of the nature of the forum would follow automatically from this identification; we have repeatedly referred to public streets as the archetype of a traditional public forum. "[T]ime out of mind" public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum. [Brookfield and the other defendants], however, urge us to disregard these "clichés." They argue that the streets of Brookfield should be considered a nonpublic forum. Pointing to the physical narrowness of Brookfield's streets as well as to their residential character, appellants contend that such streets have not by tradition or designation been held open for public communication.

> We reject this suggestion. Our prior holdings make clear that a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood....

> In short, our decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a "cliché," but recognition that "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public." No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora. Accordingly, the streets of Brookfield are traditional public fora....

*Id.* at 480–81, 108 S.Ct. 2495 (citations omitted).

*Frisby* does not explicitly state that all traditional public fora may be identified so easily. Nonetheless, *Frisby*'s rejection of Brookfield's argument strongly suggests as much, with no need to refer to any particular characteristics of the space in question.

### 5. *Kokinda* (1990)

A potential breakdown in the doctrinal consensus was on display about two years after *Frisby* in a fractured decision captioned *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). *Kokinda* concerned a Postal Service regulation that prohibited solicitation on Post Office premises, as applied to a sidewalk leading from a particular Post Office's parking lot into the Post Office itself. *Id.* at 722–24, 110 S.Ct. 3115.

*Kokinda* produced no majority opinion. Justice O'Connor (writing for herself, Chief Justice Rehnquist, and Justices White and Scalia) concluded that the sidewalk in question "[d]id not have the characteristics of public sidewalks traditionally open to expressive activity.... [T]he postal sidewalk was constructed solely to provide for the passage of individuals engaged in postal business...not to facilitate the daily commerce and the life of the neighborhood or city." *Id.* at 727–28, 110 S.Ct. 3115. This appears to be a deviation from previous cases, where a public sidewalk was a public forum simply because it was a public sidewalk. That is precisely the criticism leveled in an opinion by Justice Brennan, writing also for Justices Marshall, Stevens, and (in relevant part) Blackmun. *Id.* at 740–49, 110 S.Ct. 3115. Justice O'Connor responded by pointing to the language in *Grace* that nothing distinguished the sidewalks surrounding the Supreme Court from any other public sidewalk in Washington, D.C. *Id.* at 728, 110 S.Ct. 3115. But instead of arguing that the Post Office sidewalk pos-

sessed such distinguishing characteristics, Justice O'Connor offered a broader statement: "the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum." *Id.* at 728–29, 110 S.Ct. 3115. But, again, this was simply the opinion of four justices, as was Justice Brennan's opinion.

Justice Kennedy, writing for himself only, was the tiebreaker. He opined, "If our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control the case." *Id.* at 737–38, 110 S.Ct. 3115. Justice Kennedy nowhere explained precisely what he meant by this, nor did he make clear whether this was meant as a criticism of anything in either Justice O'Connor's or Justice Brennan's respective opinions. From one perspective, one might interpret this as an expression of *agreement* with Justice O'Connor regarding the need for an inquiry into "the location and purpose of a publicly owned sidewalk." However, Justice Kennedy did not make any such agreement explicit, and in fact announced that he could avoid categorizing the sidewalk as a public or nonpublic forum because, in his view, the Postal Service regulation in question survived scrutiny under the strict standard applied to traditional public fora. *Id.* at 738, 110 S.Ct. 3115. He therefore concurred in the O'Connor opinion's judgment, which found that the sidewalk was a nonpublic forum and that the Postal regulation satisfied the reasonableness standard. *Id.* at 733–37, 110 S.Ct. 3115.

Thus, the outcome of *Kokinda* was that the Postal Service regulation stood under any applicable standard of review, although with no majority opinion regarding the proper forum classification of the sidewalk.

## 6. *Lee* (1992)

The fractures evident in *Kokinda* soon returned in *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) ("*Lee*"). The plaintiffs in *Lee* were disseminating religious literature and soliciting funds at the airports controlled by the Port Authority of New York and New Jersey (JFK, LaGuardia, and Newark). *Id.* at 674–75, 112 S.Ct. 2701. By regulation, however, the Port Authority prohibited "continuous or repetitive" person-to-person solicitation and distribution of literature. *Id.* at 675–76, 112 S.Ct. 2701. The Second Circuit held that the airports were not public fora and that the regulation was reasonable as to solicitation but not as to distribution. *Id.* at 677, 112 S.Ct. 2701. The dispute then went to the Supreme Court, which granted *certiorari* specifically "to resolve whether airport terminals are public fora," among other questions. *Id.*

Relying on a historical-categorical approach divorced from consideration of any specific airport terminal, the Court answered the public forum question in the negative:

[A]irport terminals have only recently achieved their contemporary size and character.... [G]iven the lateness with which the modern air terminal has made its appearance, it hardly qualifies for the description of having "immemorially ...time out of mind" been held in the public trust and used for purposes of expressive activity. Moreover, even within the rather short history of air transport, it is only "[i]n recent years [that] it has become a common practice for various religious and non-profit organizations to use commercial airports as a forum for the distribution of literature, the solicitation of funds, the proselytizing of new members, and other similar activities." Thus, the tradition of airport

activity does not demonstrate that airports have historically been made available for speech activity.

*Id.* at 680, 112 S.Ct. 2701 (citations omitted). "Nor can we say," the Court continued, "that these particular terminals, or airport terminals generally, have been intentionally opened by their operators to such activity; the frequent and continuing litigation evidencing the operators' objections belies any such claim." *Id.* at 680–81, 112 S.Ct. 2701. Then, invoking the reasonableness test that applies to government regulation of nonpublic fora, the Court affirmed the Second Circuit's holding that the solicitation ban was reasonable. *Id.* at 683–85, 112 S.Ct. 2701.

Five justices (Rehnquist, White, O'Connor, Scalia, and Thomas) joined all of the major rulings regarding the solicitation ban, including the nonpublic forum status of airport terminals and the reasonableness of the ban. The outcome regarding the distribution ban, however, commanded no majority opinion. Justice O'Connor, applying the reasonableness standard for nonpublic fora, agreed with the Second Circuit that the distribution ban was *not* reasonable. *Id.* at 690–93, 112 S.Ct. 2711 (opn. of O'Connor, J.). Justice Kennedy, joined in relevant part by Justices Blackmun, Stevens, and Souter, agreed that the Second Circuit's judgment regarding the distribution ban should be affirmed, but on different grounds, namely, under a strict scrutiny test (because these justices believed that the airport terminals should be deemed a public forum). *Id.* at 708–10, 112 S.Ct. 2711 (opn. of Kennedy, J.). The result was that the Second Circuit's invalidation of the distribution ban was affirmed without any opinion commanding a majority view.

Justice Kennedy's opinion (on behalf of himself and Justices Blackmun, Stevens, and Souter) dissented from the majority's approach to classifying airport terminals as nonpublic fora: "Our public forum doctrine ought not to be *a jurisprudence of categories* rather than ideas or convert what was once an analysis protective of expression into one which grants the government authority to restrict speech by fiat." *Id.* at 693–94, 112 S.Ct. 2711 (emphasis added). However, he said, "it seems evident that under the Court's analysis today few, if any, types of property other than those already recognized as public forums will be accorded that status." *Id.* at 697, 112 S.Ct. 2711. In Justice Kennedy's view, "the policies underlying the [public forum] doctrine cannot be given effect unless we recognize that open, public spaces and thoroughfares that are suitable for discourse may be public forums, whatever their historical pedigree and without concern for a precise classification of the property." *Id.*

Justice Kennedy then returned to the "objective characteristics"/"customary use" paradigm he had mentioned in *Kokinda* but failed to expound upon:

Under the proper circumstances I would accord public forum status to other forms of property, regardless of their ancient or contemporary origins and whether or not they fit within a narrow historic tradition. If the objective, physical characteristics of the property at issue and the actual public access and uses that have been permitted by the government indicate that expressive activity would be appropriate and compatible with those uses, the property is a public forum. The most important considerations in this analysis are whether the property shares physical similarities with more traditional public forums, whether the government has permitted or acquiesced in broad public access to the property, and whether expressive activity would tend to interfere in a significant way with the uses to which the

government has as a factual matter dedicated the property. . .

*Id.* at 698–99, 112 S.Ct. 2711. Notably, although Justice Kennedy did not cite *Cornelius* in this portion of his opinion, his proposed analysis is materially indistinguishable from the factors *Cornelius* prescribed for evaluating whether the government has created a *designated* public forum. (*See* Part IV.B.3, above.)

As will become clear below, Justice Kennedy's exposition here takes on surprising importance in the Tenth Circuit's *First Unitarian* decision, which accords it controlling weight. It is nonetheless beyond debate that five Supreme Court justices in *Lee* agreed under a historical-categorical analysis that airport terminals are not public fora. *Id.* at 680–81, 112 S.Ct. 2701.[7]

### 7. *Church on the Rock* (10th Cir. 1996)

For present purposes, the first relevant Tenth Circuit decision came four years after *Lee*, and was a dispute over whether a church could exhibit a religious-themed film at a city-owned senior center. *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273 (10th Cir. 1996). Principally citing *Perry* and *Cornelius*, the Tenth Circuit set forth the three types of fora (traditional public, designated public, and nonpublic) along with the standards of review attached to each. *Id.* at 1278. Then, without any analysis into any particular senior center, the Tenth Circuit announced that the senior center in question "may not be classified as a traditional public forum because it is not a traditional location of public debate or assembly." *Id.* The senior center was, rather, a designated public forum given city policies that allowed non-seniors to use senior centers for classes, lectures, and presentations. *Id.* at 1277, 1278. The Tenth

Circuit held that the city did not satisfy strict scrutiny in excluding religious-themed messages from this policy. *Id.* at 1280–81.

*Church on the Rock*, then, affirms that the traditional public form analysis is essentially a question of preexisting categories.

### 8. *Forbes* (1998)

The forum-analysis debate soon returned to the Supreme Court in *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (*"Forbes"*), a case about whether a state-owned public television station lawfully excluded an independent Congressional candidate from a televised debate featuring the Republican and Democratic candidates for that same seat. *Id.* at 670–71, 118 S.Ct. 1633. Thankfully, *Forbes* produced a majority opinion—written by none other than Justice Kennedy.

Justice Kennedy's opinion for the Court begins its analysis with a fairly typical recitation of the three forum categories established by the preceding fifteen years' jurisprudence. *Id.* at 677–78, 118 S.Ct. 1633. However, Justice Kennedy inserted a small measure of his "objective characteristics" language (from *Kokinda* and *Lee*) into the description of a traditional public forum:

> Traditional public fora are defined by the objective characteristics of the property, such as whether, "by long tradition or by government fiat," the property has been "devoted to assembly and debate."
>
> . . .

\* \* \*

---

7. The Tenth Circuit has applied this holding in a categorical manner. *Mocek v. City of Albuquerque,* 813 F.3d 912, 930 (10th Cir. 2015) ("As an initial matter, an airport is a

nonpublic forum, where restrictions on expressive activity need only 'satisfy a requirement of reasonableness.' " (quoting *Lee,* 505 U.S. at 683, 112 S.Ct. 2701)).

...traditional public fora are open for expressive activity regardless of the government's intent. The objective characteristics of these properties require the government to accommodate private speakers.

*Id.* at 677–78, 118 S.Ct. 1633. Lest this be seen as some sort of doctrinal innovation, however, Justice Kennedy quickly went on to confirm that the traditional public forum category is essentially closed: "The Court has rejected the view that traditional public forum status extends beyond its historic confines, *see* [*Lee* ], 505 U.S., at 680–681, 112 S.Ct. 2701...." *Id.* at 678, 118 S.Ct. 1633. Justice Kennedy then reasoned that the television debate was a nonpublic forum and that the state acted reasonably in its refusal to allow participation by the independent candidate. *Id.* at 678–83, 140 L.Ed.2d 875.

In short, *Forbes* is something of a feint toward opening up the traditional public forum category based on the notion of "objective characteristics," but it then pulls back by affirming that the category is "historic[ally] confine[d]." *Id.* at 678, 140 L.Ed.2d 875. Moreover, the only examples *Forbes* provided of such "objective characteristics" are those used by *Perry* to describe traditional and designated public fora: "whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" *Id.* at 677, 118 S.Ct. 1633 (quoting *Perry*, 460 U.S. at 45, 103 S.Ct. 948).

### 9. *Hawkins* (10th Cir. 1999)

About a year after *Forbes*, the Tenth Circuit decided another forum-analysis case, this time regarding the "Galleria," *i.e.*, the large open-air plaza/walkway connecting the various theaters, concert halls, and other facilities of the Denver Performing Arts Complex ("DPAC"). *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1284 (10th Cir. 1999). Before the Galleria's construction, the area had been a public street, but the Galleria was now restricted to foot traffic only. *Id.* A Denver policy banned all picketing and leafleting on the Galleria. *Id.* at 1284 & n.2.

The Tenth Circuit found that the Galleria was not a traditional public forum, even though it had once been a public street:

> The Galleria does not qualify as a traditional public forum, for it is not a park, nor is it analogous to a public right of way or thoroughfare. The Galleria does not form part of Denver's automotive, bicycle or pedestrian transportation grid, for it is closed to vehicles, and pedestrians do not generally use it as a throughway to another destination. Rather, the Galleria's function is simply to permit ingress to and egress from the DPAC's various complexes.... Moreover, the fact that the Galleria was constructed on what used to be a public street does not render it a traditional public forum. The government may, by changing the physical nature of its property, alter it to such an extent that it no longer retains its public forum status.

*Id.* at 1287. In other words, *Hawkins* employed a straightforward categorical analysis, although with reference to the factual record to confirm that the Galleria no longer possessed the characteristics of a public street. *Hawkins* went on to conclude that the Galleria was a nonpublic forum and that Denver's restrictions were reasonable. *Id.* at 1287–92.

### 10. *First Unitarian* (10th Cir. 2002)

We now reach the *First Unitarian* decision, which, as noted above, is difficult to square with decisions that preceded it. *First Unitarian* "concern[ed] a portion of Main Street in downtown Salt Lake City that the City closed and sold to the Church of Jesus Christ of Latter–Day Saints (LDS Church)." 308 F.3d at 1117. The portion of Main Street in question ran between two

city blocks owned by the LDS Church, with the iconic "Temple Square" on the west side of Main Street and various LDS Church administrative buildings occupying the block on the east side of Main Street. *Id.*

In 1998 and 1999, the City and the LDS Church put in motion a plan to close that portion of Main Street and convert it to a pedestrian plaza uniting the two Church-owned blocks. *Id.* at 1117–18. The City therefore sold that portion of Main Street to the LDS Church but also reserved to itself a pedestrian easement. *Id.* at 1118. The easement, however, declared that it should not "be deemed to create or constitute a public forum" and went on to reserve to the LDS Church the right to prohibit numerous activities, including activities such as demonstrating and picketing. *Id.* (internal quotation marks omitted). The LDS Church then went on to redevelop that former segment of Main Street into a Plaza with "planters, benches, and waterfalls, a large reflecting pool, and changes in grade." *Id.* at 1119.

A number of local groups eventually sued, "assert[ing] [that] the [easement's] restrictions are facially invalid because the entire plaza, or alternatively the retained easement, remains public property on which speech cannot be so restricted." *Id.* The plaintiffs, however, later abandoned their claim as directed at the entire plaza, and therefore narrowed the case to the question of the City's easement. *Id.* at 1120 n.3. The district court granted summary judgment for the City and the LDS Church (as intervenor), but the Tenth Circuit reversed.

The Tenth Circuit first satisfied itself that the City's easement comprised the sort of public property interest to which First Amendment forum analysis could apply. *Id.* at 1121–24. Having so decided, the Tenth Circuit set forth the three categories of fora and quickly "reject[ed] the

contention that the City's express intention not to create a public forum controls [the] analysis. The government cannot simply declare the First Amendment status of property regardless of its nature and its public use." *Id.* at 1124. Only in the case of designated public fora, said the Tenth Circuit, is an inquiry into governmental intent appropriate. *Id.* at 1124–25.

This becomes a key transition point in the Tenth Circuit's opinion, and the beginning of what this Court respectfully deems to be a certain amount of confusion. In support of this proposition regarding governmental intent, the court cites *Forbes*, *Cornelius*, and *Hawkins*—all of which are on-point for that particular proposition. The Tenth Circuit then follows these citations with a "cf." cite to a part of Justice Kennedy's concurring-in-judgment opinion in *Kokinda* where he discusses what the Tenth Circuit characterizes as "objective factors" that courts might need to consider regardless of governmental intent. *Id.* at 1124–25 (citing *Kokinda*, 497 U.S. at 738, 110 S.Ct. 3115). Finally, in a footnote attached to the citation, the Tenth Circuit announces, "We cite Justice Kennedy's [*Kokinda*] concurrence *as controlling Supreme Court precedent* because his concurrence provided the fifth vote on the narrowest grounds." *Id.* at 1125 n.6 (emphasis added).

■ Again, with great respect, this reasoning appears incorrect. When a Supreme Court justice provides the necessary fifth vote through a concurring-in-judgment opinion, it does not thereby transform that justice's entire opinion into controlling Supreme Court precedent. Rather, the question is the "*position* taken by those Members who concurred in the judgments *on the narrowest grounds*." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (emphasis added; internal quotation marks omitted). And this

only produces a true holding "when [the concurring-in-judgment] opinion is a logical subset of other, broader opinions." *Large v. Fremont Cnty.*, 670 F.3d 1133, 1141 (10th Cir. 2012) (internal quotation marks omitted). The question as it related to *Kokinda*, then, was the narrowest ground on which Justice Kennedy concurred with Justice O'Connor, and that was simply that the Post Office regulation at issue did not violate even the strictest potential standard of review.

Nonetheless, having decided that Justice Kennedy's entire *Kokinda* opinion deserved controlling weight, the Tenth Circuit went on to cite the same portion of *Kokinda* as support for the following transitional sentence:

> In contrast [to designated public fora], for property that is or has traditionally been open to the public, objective characteristics are more important and can override express government intent to limit speech. *See Kokinda*, 497 U.S. at 738, 110 S.Ct. 3115 (Kennedy, J., concurring) (legitimate justifications for restrictions notwithstanding, "other factors may point to the conclusion that the Government must permit wider access to the forum than it has otherwise intended.")...

*First Unitarian*, 308 F.3d at 1125 (parallel citation omitted). The court then went on to link "objective characteristics" to *Forbes*: "As Justice Kennedy wrote for a majority in *Forbes*, 'public fora are defined by the objective characteristics of the property.'" *Id.*

And what does "objective characteristics" mean? According to the Tenth Circuit, "Justice Kennedy elaborated on what he meant by examining objective characteristics to determine if property is a public forum in his concurrence in [*Lee* ]." *Id.* The Tenth Circuit then block-quoted the portion of Justice Kennedy's *Lee* opinion in which he calls for consideration of "wheth-

er the property shares physical similarities with more traditional public forums," "whether the government has permitted or acquiesced in broad public access to the property," and "whether expressive activity would tend to interfere in a significant way with the uses to which the government has as a factual matter dedicated the property." *Id.* (quoting *Lee*, 505 U.S. at 698–99, 112 S.Ct. 2711). (*See also* Part IV.B.6, above.) Finally, the Tenth Circuit declared that it would "apply these factors to assess the easement's character for First Amendment purposes." *Id.*

The Tenth Circuit's reasoning appears to have been as follows: Justice Kennedy's deemed-to-be-controlling *Kokinda* opinion, and his later majority opinion in *Forbes*, both say that "objective characteristics" govern the question of whether a public space is a traditional public forum; therefore, Justice Kennedy's elaboration on "objective characteristics" in a *different* opinion (*Lee*) has now been adopted by a majority of the Supreme Court. This reasoning displays several difficulties.

First, as noted, Justice Kennedy's opinion in *Kokinda* is not controlling on the doctrinal point of how a traditional public forum is identified. Second, as described above in Part IV.B.8, Justice Kennedy's re-invocation of "objective characteristics" in the *Forbes* majority opinion cannot be read as an importation of his views expressed in prior non-majority opinions— and in particular not his views in *Lee*— given his statement in *Forbes* that *Lee* "rejected the view that traditional public forum status extends beyond its historic confines." 523 U.S. at 678, 118 S.Ct. 1633. Third, the *First Unitarian* opinion itself later implicitly acknowledges that Justice Kennedy's *Lee* opinion was not controlling in any respect. *First Unitarian*, 308 F.3d at 1125 & n.7 (citing Justice O'Connor's *Lee* concurrence and noting that it "provid-

ed the fifth vote on the narrowest grounds").

Nonetheless, the Tenth Circuit went on to examine the easement's nature and purpose, its compatibility with expressive activities, and whether the City had expressly designated speech as a purpose of the property. *Id.* at 1126–31. Among various considerations, the Tenth Circuit noted what would have been (in this Court's view) the dispositive factors: (1) "[t]he easement through the plaza was specifically retained in order to preserve and enhance the pedestrian grid in the downtown," *id.* at 1126; and (2) "because the purpose of the easement is not limited to ingress and egress to Church facilities, but is intended rather for pedestrian passage, it is distinguishable from those walkways that have been held not to be public fora [such as the Galleria in *Hawkins* or the Post Office sidewalk in *Kokinda*]," *id.* at 1127. Under traditional forum analysis, these considerations alone would appear to be enough to declare that the City had not effectively divested itself of the preexisting property interest, which was certainly a traditional public forum (*i.e.*; a public sidewalk).[8] In any event, based on the foregoing and many other considerations, the court concluded that the easement was a public forum, and that the City's restrictions failed strict scrutiny. *Id.* at 1131–33.

### 11. *Doe* (10th Cir. 2012)

The Tenth Circuit has since reverted to the historical-categorical approach, as evidenced in *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012). *Doe* addressed a municipal policy banning registered sex offenders from public libraries. *Id.* at 1115–16. Neither side of the dispute had contended that public libraries were a traditional public forum, and the Tenth Circuit explicitly announced its agreement with the parties' apparent concession: "public libraries are not analogous to 'streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* at 1129 n.11 (quoting *Perry*, 460 U.S. at 45–46, 103 S.Ct. 948). The Tenth Circuit instead found that the library in question was a designated public forum and that the city's policy failed strict scrutiny. *Id.* at 1128–35.

### 12. *McCullen* (2014)

The Supreme Court also continues to speak of traditional public fora in historical-categorical terms, as in *McCullen v. Coakley*, — U.S. —, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014), a case regarding a Massachusetts statute designed to restrict "sidewalk counseling" by anti-abortion activists outside abortion clinics. *Id.* at 2526–27. Although the case was unquestionably about a traditional public forum (public streets and sidewalks), the Supreme Court spoke in terms of categories and "labels":

> Such areas occupy a "special position in terms of First Amendment protection" because of their historic role as sites for discussion and debate. [*Grace*, 461 U.S. at 180, 103 S.Ct. 1702.] These places— which we have labeled "traditional public fora"—"'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Pleasant Grove*

---

**8.** In fact, on remand, the City and the LDS Church appear to have adopted this view. The City simply sold the easement outright to the Church, thus ceding all control. *See generally Utah Gospel Mission v. Salt Lake City Corp.*,

425 F.3d 1249 (10th Cir. 2005) (upholding sale against various constitutional challenges, and finding the plaza was now entirely private property and no longer subject to First Amendment analysis).

*City v. Summum*, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (quoting [*Perry*, 460 U.S. at 45, 103 S.Ct. 948]).

\* \* \*

In short, traditional public fora are areas that have historically been open to the public for speech activities.

*Id.* at 2529 (parallel citations omitted). The Court went on to conclude that the Massachusetts statute was not narrowly tailored to serve a significant governmental interest, and was therefore unconstitutional. *Id.* at 2530–41.

13. Synthesis & Conclusion

The vast weight of Supreme Court and Tenth Circuit authority approaches the traditional public forum question simply by asking whether the public space in question fits within a pre-existing category declared by the Supreme Court itself: public streets, public sidewalks, and public parks. By analogy, a number of extra-circuit cases have added to this list public spaces that abut or lead into legislative or executive buildings, such as a pedestrian mall spreading away from such a building, *see Warren v. Fairfax Cnty.*, 196 F.3d 186, 190 (4th Cir. 1999), or the steps of city hall, *see Pouillon v. City of Owosso*, 206 F.3d 711, 716–17 (6th Cir. 2000). But the inquiry remains the same: Is this public space within the category of public spaces that have, by long tradition, been recognized as places for public assembly, advocacy, and debate? To be sure, one can fairly criticize this approach from a doctrinal point of view—as Justice Kennedy has done—because the list it generates is essentially frozen in time. But, as Justice Kennedy has also acknowledged, the Supreme Court has rejected any other approach. *Forbes*, 523 U.S. at 678, 118 S.Ct. 1633.

This does not mean that a more-specific factual inquiry into the contested space is never needed. A good example is *Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015),

*cert. denied,* —— U.S. ——, 136 S.Ct. 2009, 195 L.Ed.2d 215 (2016), which is essentially the sequel to *Grace*. Whereas *Grace* dealt with the sidewalks surrounding the Supreme Court building, *Hodge* addressed the plaza fronting the building's public entrance. *Id.* at 1149–50. The D.C. Circuit found great significance in *Grace*'s observation that nothing about the surrounding sidewalks would signal to a person that he or she had " 'entered some special type of enclave.' " *Id.* at 1158 (quoting *Grace*, 461 U.S. at 180, 103 S.Ct. 1702). By contrast,

> [t]he plaza's appearance and design vividly manifest its architectural integration with the Supreme Court building, as well as its separation from the perimeter sidewalks and surrounding area. The plaza is elevated from the sidewalk by a set of marble steps. A low, patterned marble wall—the same type of wall that encircles the rest of the building— surrounds the plaza platform and defines its boundaries. And the plaza and the steps rising to it are composed of white marble that contrasts sharply with the concrete sidewalk in front of it, but that matches the staircase ascending to the Court's front doors and the façade of the building itself.

*Id.* Further finding that "[t]he area surrounding a courthouse traditionally has not been considered a forum for demonstrations and protests," *id.* at 1159, the D.C. Circuit eventually concluded that the Supreme Court grounds within its perimeter sidewalks were a nonpublic forum, *id.* at 1158–62. The D.C. Circuit also concluded that the government's regulation of the plaza was reasonable in light of the purposes served by the picketing restriction, namely, maintaining decorum and preserving the appearance of a judiciary immune to public pressure. *Id.* at 1162–70.

The *Hodge* decision thus demonstrates that, following *Grace*, a plaintiff might ar-

gue for traditional public forum status because a location falling outside the "traditional" category is effectively indistinguishable from surroundings that are indisputably traditional public fora. And, presented with such an argument, a court must make a factual inquiry into the specific characteristics of the contested space as compared to its surroundings. But nothing in *Hodge*, or any other case of which this Court is aware apart from *First Unitarian*, suggests that the inquiry must go deeper, *e.g.*, into specific historical uses of the space in question, its compatibility with expression, etc. As already noted, inquiries into history, compatibility with expression, and other "objective characteristics" are essentially what the Supreme Court set forth in *Cornelius* as relevant to whether the government had *designated* a public forum, not whether a particular space is a traditional public forum. (*Compare* Parts IV.B.3 & IV.B.6, above.) [9]

All that said, both Plaintiffs and the Second Judicial District argue from *First Unitarian* as if it is controlling here. So what to do with *First Unitarian*? The Court observes that *First Unitarian* did not announce its approach as the definitive or mandatory approach to traditional public forum inquiries. Rather, *First Unitarian* set forth Justice Kennedy's exposition on "objective characteristics" from *Lee*, and then simply stated, "We apply these factors to assess the easement's character for First Amendment purposes." 308 F.3d at 1125. Given this, the Court concludes that *First Unitarian* is best read as an analysis specific to the unique situation presented there—the government sold a traditional public forum to a private party but retained an easement in the property so that the property would continue to serve the same purpose it served (from the government's perspective) before the sale. If *First Unitarian* is treated any more broadly, it basically collapses any distinction between traditional and designated public fora—which most certainly contradicts Supreme Court forum analysis precedent.

█ Here, the Courthouse is a recently-built structure, but no party has presented evidence of how the land was used before it was built. In particular, no party has presented evidence of how the land now comprising the Restricted Area had previously been used. Accordingly, *First Unitarian*'s analysis does not apply. The Court therefore applies the historical-categorical approach to the question of whether the Restricted Area is a traditional public forum.

## C. Plaintiffs' Lack of Standing to Challenge the West Side Restricted Area

█ The portions of the Restricted Area on the west side of the Courthouse encompass parts of a public sidewalk. (¶ 4.) [10] Following *Grace*, then, a traditional public forum analysis would normally be appropriate. However, Plaintiffs have shown no desire or intent to advocate on the west

9. Cf. *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1151–58 (7th Cir. 1995) (holding that certain display case in an airport was designated public forum based on "consistent policy and practice"); *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 116–18 (5th Cir. 1992) (holding that a public university campus was a designated public forum for student speech given historical practice and policy); *Paulsen v. Cnty. of Nassau*, 925 F.2d 65, 69–71 (2d Cir. 1991) (holding that a public stadium complex was a designated public forum based on evidence of its historical use and lack of enforcement of a supposed policy against leafleting).

10. All citations to a paragraph number, without more, are to the Court's findings of fact in Part III, above.

side of the Courthouse. That side is lightly used and is not an effective place to spread their message, given that the vast majority of persons with court business enter and exit through the Main Entrance on the east side. (¶¶ 5, 19, 29–31, 50.) Plaintiff Matzen distributed literature at the West Entrance while the Main Entrance was closed for construction (¶ 51), but Plaintiffs have failed to introduce evidence from which the Court could find any ongoing or "present desire...to engage in...speech [prohibited by the Plaza Order]" on the west side of the Courthouse. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006).

Plaintiffs therefore have failed to establish that the Plaza Order, as it relates to the west side of the Courthouse, threatens imminent injury to their First Amendment rights. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (injury sufficient to support standing must be "actual or imminent, not conjectural or hypothetical" (internal quotation marks omitted)). Plaintiffs therefore lack standing to challenge the Plaza Order to the extent the Restricted Area encompasses certain areas on the west side of the Courthouse.[11]

## D. Forum Status of East Side Restricted Area

The Court now turns to the Restricted Area as it relates to the east side of the Courthouse. All further references in this order to "Restricted Area" refer only to the east side of the Courthouse.

Plaintiffs argue that the Restricted Area is a traditional public forum. As already noted, the Supreme Court treats the traditional public forum category as a historically closed set comprising public streets, public sidewalks, and public parks. The Supreme Court has never addressed whether the grounds of a courthouse might also fall into this category, save for the surrounding public sidewalks. A courthouse-related decision pre-dating the Court's systematic "forum analysis" approach, *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), seems to point in two directions.

*Cox* arose from an individual's conviction for violating a Louisiana statute that prohibited "pickets or parades in or near a building housing a court of the State of Louisiana" if done "with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty." *Id.* at 560, 85 S.Ct. 476 (internal quotation marks omitted). The Supreme Court treated this statute not as a regulation of expression alone, but as regulation of "expression mixed with particular conduct," namely picketing and parading. *Id.* at 564, 85 S.Ct. 476. And in this light, the Court said,

[t]here can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy. The constitutional safeguards relating to the integrity of the criminal process attend every stage of a criminal proceeding, starting with arrest and culminating with a trial in a courtroom presided over by a judge. There can be

11. For similar reasons, there is a fair argument that Plaintiffs lack standing as to the Arced Walkway. (*See* Tr. at 82 (Plaintiff Verlo denying interest in demonstrating on the Arced Walkway, given its obscurity).) However, Plaintiffs' claim as to the Arced Walkway fails on its merits in any event, as described below.

no doubt that they embrace the fundamental conception of a fair trial, and that they exclude influence or domination by either a hostile or friendly mob. There is no room at any stage of judicial proceedings for such intervention; mob law is the very antithesis of due process. A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence. A narrowly drawn statute such as the one under review is obviously a safeguard both necessary and appropriate to vindicate the State's interest in assuring justice under law.

*Id.* at 562, 85 S.Ct. 476 (citations omitted). Moreover, the Court went on to declare that

the legislature has the right to recognize the danger that some judges, jurors, and other court officials, will be consciously or unconsciously influenced by demonstrations in or near their courtrooms both prior to and at the time of the trial. A State may also properly protect the judicial process from being misjudged in the minds of the public. Suppose demonstrators paraded and picketed for weeks with signs asking that indictments be dismissed, and that a judge, completely uninfluenced by these demonstrations, dismissed the indictments. A State may protect against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process.

*Id.* at 565, 85 S.Ct. 476.

On the one hand, this reasoning seems to validate much of what the Plaza Order was intended to promote, namely, "a neutral forum free of actual or perceived partiality, bias, prejudice, or favoritism," and "to provide for the fair and orderly conduct of hearings and trials." (¶ 35.) On the

other hand, the Supreme Court made much of the fact that the Louisiana statute was "narrowly drawn" to prohibit picketing and parading, a form of conduct that it found separable from expression itself. *Cox*, 379 U.S. at 562, 564, 85 S.Ct. 476. This looks somewhat like a strict scrutiny analysis applicable to what the Court would later call a traditional public forum.

From a broader perspective, moreover, courthouses are undeniably the locations of momentous political and social decisions, just like legislative and executive buildings. And demonstrations at least *near* (if not on) the grounds of a courthouse seem to be a relatively common affair throughout the country.

Nonetheless, since the advent of historical-categorical forum analysis in *Perry*, apparently *every* court to address the issue has held that the grounds of a courthouse (apart from surrounding public sidewalks) are *not* a traditional public forum. *See Hodge*, 799 F.3d at 1161 ("[T]here is no background assumption—grounded in tradition—that the [Supreme Court plaza] is a public forum. The plaza plainly is not a street or sidewalk. Nor is it a park."); *Huminski v. Corsones*, 396 F.3d 53, 90–91 (2d Cir. 2005) (courthouse grounds, including its parking lots, were not a traditional public forum); *Sammartano v. First Judicial District Court*, 303 F.3d 959, 966 (9th Cir. 2002) (combined municipal-judicial building was not a traditional public forum because it was "not, like a public street or park, the kind of public property that has 'by long tradition or by governmental fiat...been devoted to assembly and debate'" (quoting *Perry*, 460 U.S. at 45, 103 S.Ct. 948)), *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *United States v. Gilbert*, 130 F.3d 1458, 1461–62 (11th Cir. 1997) (portion of courthouse grounds had previously been a designated public

forum, but the government permissibly withdrew that designation and imposed new restrictions that satisfied the reasonableness standard applicable to nonpublic fora); *Schmidter v. State*, 103 So.3d 263, 270 (Fla. Dist. Ct. App. 2012) ("courthouses and courthouse grounds (with the exclusion of perimeter public sidewalks) have uniformly been treated as nonpublic forums for purposes of First Amendment analysis"). Notably, Plaintiffs have cited no contrary authority.

■ This Court need not decide the proper forum designation for courthouse grounds generally, because only the Restricted Area is at issue here. The Restricted Area was primarily intended to be, and in fact functions as, an ingress/egress area for those with court business—in effect, as an extension of the Courthouse lobby. (¶¶ 19–21, 30–31.) At least that portion of the grounds of a courthouse has never been traditionally viewed as an area of public assembly and debate. Thus, it does not qualify as a traditional public forum. Moreover, there is no argument that the Second Judicial District has designated the Restricted Area as a public forum.

As for the questions raised in *Grace* and *Hodge*, the average pedestrian can easily distinguish the Patio and Arced Walkway (which comprise the Restricted Area) from the surrounding public sidewalks, and from the Circular Plaza, and thus the average pedestrian would understand that he or she had "entered some special type of enclave" when setting foot on the Patio or Arced Walkway. *Grace*, 461 U.S. at 180, 103 S.Ct. 1702. The Arced Walkway is bordered by Landscaping on one side and the Gravel Area on the other; it comprises a series of shallow steps that are unusual on public sidewalks; and, due to its shape

and location, it signals to anyone approaching it from the public sidewalk on the Colfax Avenue side that it can only lead closer to the Courthouse, and not, for example, to some location beyond the Courthouse. (¶¶ 10–13.)

As for the Patio, a pedestrian must ascend steps or a shallow grade to reach it and then pass through bollards,[12] after which the pedestrian would find higher quality building materials and landscaping along with concrete that differs from the surrounding concrete in color and texture. (¶¶ 14–17, 22.) Consequently, there is no basis for treating the Restricted Area as anything but a nonpublic forum. *Cf. Hodge*, 799 F.3d at 1158–59 (holding that the Supreme Court plaza is a nonpublic forum based on its architectural integration with the Supreme Court building itself and its features that distinguish it from the surrounding sidewalks, including its raised elevation, its enclosure, and its distinctive paving materials).

■ First Amendment restrictions in a nonpublic forum may still be challenged as unreasonable in light of the purposes they are intended to serve. *See Hawkins*, 170 F.3d at 1287. But Plaintiffs have consistently failed to advance any unreasonableness argument, even in the alternative, and the Court therefore finds that Plaintiffs have waived such a challenge in the true sense of "waiver," *i.e.*, " 'intentional relinquishment or abandonment of a known right." *United States v. Carrasco–Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007) (internal quotation marks omitted). Thus, the Court has no occasion to examine the Plaza Order for reasonableness, and the Court's Preliminary Injunction must be dissolved.

---

12. A pedestrian using the Arced Walkway to reach the Patio would not pass through bollards. But, as already noted, the Arced Walk-

way itself signals to any pedestrian that he or she has left the normal pedestrian grid and entered a special enclave.

## V. CLOSING OBSERVATIONS

Plaintiffs began this lawsuit seeking to vindicate the precious freedom of expression protected by the First Amendment. But the trajectory of this case has taken a turn few would have predicted two years ago. On the one hand, Denver immediately turned its back on the Second Judicial District—motivated, the Court suspects, more by fiscal considerations than by any truly principled commitment to freedom of expression in the Restricted Area.

Plaintiffs and their fellow demonstrators, on the other hand, at times came to grossly abuse the expressive freedom granted to them in the Preliminary Injunction. The undersigned was very disturbed by some of the testimony elicited at the Bench Trial, testimony which described the conduct of some of the demonstrators inside the Restricted Area. This troubling conduct most often targeted hard-working, earnest employees of the Second Judicial District, for no apparent reason other than their status as state judicial branch employees. It was difficult for the undersigned to listen to testimony from these individuals—including the Chief Judge—describing the significant deterioration of the quality of their daily work life brought about by the implementation of the Preliminary Injunction. This problematic behavior on the part of Plaintiffs and their allies was frequently needlessly combative, aggressively intimidating, gratuitously vulgar, and intentionally disruptive—often with no apparent purpose or point other than to flaunt the supposed right to be combative, intimidating, vulgar, and disruptive.

Perhaps some of this behavior amounted to a criminal violation and need not have been tolerated. Plaintiffs' counsel repeatedly tried to make that very point at the Bench Trial. But the Court is also sympathetic to the fine line that government officials must walk in this regard. It is technically a criminal offense, for example, to "[r]epeatedly insult[ ], taunt[ ], challenge[ ], or make[ ] communications in offensively coarse language to, another in a manner likely to provoke a violent or disorderly response." Colo. Rev. Stat. § 18–9–111(1)(h). But the Colorado Supreme Court has construed this as a "fighting words" statute, "proscrib[ing] only those words which have a direct tendency to cause acts of violence by the persons to whom, individually, the words are addressed. The test is what men of common intelligence would understand to be words likely to cause an average addressee to fight." *People ex rel. VanMeveren v. Cnty. Court in & for Larimer Cnty.,* 191 Colo. 201, 551 P.2d 716, 719 (1976); *cf. People in Interest of R.C.,* 2016 COA 166, —— P.3d ——, ¶¶ 16–17, 2016 WL 6803065, ¶¶ 16–17 (Colo. App. Nov. 17, 2016) (suggesting that "fighting words" is an all-but-extinct category). Failed prosecutions under such statutes are repeatedly the stuff of later § 1983 lawsuits. Added to that in this case was the threat of contempt under the Preliminary Injunction.

To the extent Plaintiffs broke no law and were in fact exercising their First Amendment right to freedom of expression, they apparently failed to grasp the real world, practical responsibility that accompanies that right. No doubt, the cause of civil rights in this country has more frequently than not been advanced by courageous individuals whose views or conduct were upsetting to the majority. Among other reasons, the Bill of Rights exists to protect the rights of political and racial minorities, the unpopular, and the offensive, as much—or more—than to protect the rights of the majority, or those whose views or appearance cause no disruption or offense. And the undersigned yields to no one in his resolve to defend and preserve those treasured rights. Nevertheless, when the offensive and disrup-

tive manner of communication far eclipses any ability for the listener to consider the substance of what is communicated, the speaker should realize that the pride and privilege of exercising free speech has unfortunately overtaken the purpose of doing so.

In this case, Plaintiffs crossed that line. Their "in your face" taunting of and screaming at court employees—individuals whose only offense was to attempt to discharge their duties as court employees—was wholly unnecessary and in the end counterproductive. On this record one could argue that jury nullification is less the cause that Plaintiffs seek to advance than is the cause of preserving their own perceived entitlement to emphatically disrupt the essential operations of the state judicial system, on whatever pretense, at whatever cost. Plaintiffs have manifestly failed to realize that "the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy," *Cox*, 379 U.S. at 562, 85 S.Ct. 476, including the court system's ability to protect *Plaintiffs' own First Amendment freedoms*.

## VI. CONCLUSION

For the reasons set forth, above the Court ORDERS as follows:

1. The Preliminary Injunction (ECF No. 28) is DISSOLVED;

2. The Clerk shall enter judgment in favor of the Second Judicial District and against Plaintiffs, and shall terminate this case; and

3. Each party shall bear her, his, or its own court costs.